

**FIRSTLEASE**
A Subsidiary of Firstrust Bank

Effective Date: 7/3/17   Contract No.: 201473

1 Walnut Grove Drive, Suite 300, Horsham, PA 19044
Phone: 866-493-4778 • Fax: 215-283-9870 • www.firstleaseonline.com

| | | | |
|---|---|---|---|
| Full Legal Name of Lessee: Chicago Surgical Clinic, LTD | | | Tax ID #: 36-4479531 |
| Contact Name | E-Mail: ylevitinmd@yahoo.com | | Phone #: (847) 215-0530 |
| Billing Address: 129 W. Rand Road Suite #2 | | City: ARLINGTON HEIGHTS | State: IL   Zip: 60004 |
| Equipment Vendor/Supplier: Analogic Corporation | | | |

TERMS AND CONDITIONS • PLEASE READ CAREFULLY BEFORE SIGNING

| Quantity | MAKE, MODEL, FEATURES | SERIAL NUMBER |
|---|---|---|
| | See Equipment Schedule "A" Attached Hereto And Made A Part Hereof | |

| Equipment Location (if different than Billing Address) | City | State | Zip |
|---|---|---|---|

| TERM (months) | BILLING FREQUENCY | PAYMENT AMOUNT (plus applicable taxes) | PURCHASE OPTION (may be executed only if lease is not in default) | ADVANCE PAYMENT (includes Applicable Taxes) |
|---|---|---|---|---|
| 36 | [X] Monthly  [ ] Quarterly  [ ] Other | $1,325.23 | [ ] Fair Market Value  [ ] PUT<br>[X] $1.00  [ ] $101.00<br>___ % of Equip Cost | Advance Payment(s)  $2,816.12<br>Down Payment  $0.00<br>Doc and UCC Fee  $199.00<br>TOTAL amount due at signing  $3,015.12 |

1. **Lease Agreement.** Subject to the terms of this Lease, Lessor ("Us", "We", or "Our") agrees to lease to Lessee ("You" or "Your") and You agree to lease from Us, the equipment described above ("Equipment"). This Lease contains the entire agreement between You and Us, and there are no representations, oral or written, not expressly herein. No modification of this Lease shall be effective unless in writing and signed by the parties. THIS LEASE MAY BE SIGNED IN COUNTERPARTS. YOU AGREE THAT A FACSIMILE OF YOUR SIGNATURE MAY BE TREATED AS AN ORIGINAL AND WILL BE ADMISSIBLE AS THE BEST EVIDENCE OF THE LEASE.

2. **Lease Payments.** Payments under this Lease are unconditional and will continue for the entire Term. THIS LEASE IS NON-CANCELLABLE FOR THE ENTIRE LEASE TERM. Payments are due monthly, on the scheduled due date, the first scheduled due date to be approximately thirty (30) days after the Effective Date. You agree to pay an interim rental payment in an amount not to exceed one-thirtieth (1/30th) of the Payment for each day from and including the Effective Date until the day preceding the first scheduled Payment. Time is of the essence with respect to each and every payment and with respect to performance of any and all other obligations owing to Us under this Lease. If any Payment due under this Lease is not received by Us within five (5) days of when the same comes due, You shall pay to Us (a) the overdue payment and (b) a late charge of 15% of the overdue installment or twenty five dollars ($25.00), whichever is greater. Late charges may be assessed to the maximum limits allowed by law. You agree to pay Us a charge of $50 if any payment made is dishonored or returned.

3. **No Warranties.** YOU ARE LEASING THE EQUIPMENT IN "AS IS" CONDITION. We did not manufacture it. You chose the equipment and supplier based on Your judgment. You may contact the supplier for a statement of the warranties, if any, that the manufacturer or supplier is providing. We hereby assign to You any warranties given to Us. WE MAKE NO WARRANTIES EXPRESS OR IMPLIED, INCLUDING THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. You must settle any dispute regarding the performance of the equipment with the vendor. You are responsible for installation and all service of the equipment.

4. **Non-cancellable; Supplier Not an Agent.** THE LEASE CANNOT BE CANCELLED BY YOU FOR ANY REASON, EVEN IF THE EQUIPMENT FAILS OR IS DAMAGED. We are not related to the supplier and we cannot get a refund, nor is the supplier allowed to waive or modify any term of this Lease. Neither the supplier nor any of their salesmen, employees or other agents is Our agent.

5. **Assignment.** You agree not to transfer, sell, sublease, assign, pledge or encumber either the Equipment or any rights under this Lease. We may lend, sell, assign, transfer or grant a security interest in all or part of our rights, obligations, title or interest in the Equipment or this Lease, or any amount payable under this Lease, without notice to You. In the event We assign Our interest in the Equipment and/or the Lease, Our assignee shall take such interest free and clear of any rights, claims, set-offs, counterclaims, or defenses that You may have against Us, the supplier and or any other party.

6. **Ownership; Security Interest.** All Equipment is, and shall at all times remain Our property. You grant Us a first priority security interest in this Lease, the Equipment and in all accessories to, replacements of and proceeds from the Equipment to secure the prompt payment and performance of Your obligations under this Lease. You appoint Us as attorney-in-fact to execute and file on Your behalf, and at Your cost, Uniform Commercial Code (UCC) financing statement(s) to show Our interest in the Equipment.

7. **Intent of the Parties.** You agree the Lease is a "Finance Lease" as defined in Article 2A of the UCC. You acknowledge You chose the Equipment supplier and that you may have rights under the contract with the supplier and may contact the supplier for a description of these rights. We shall not be liable to You for any loss, damage or expense of any kind or nature caused, directly or indirectly, by any Equipment leased hereunder or the use or maintenance thereof or the failure or operation thereof, or the repair, service or adjustment thereof, or by any delay or failure to provide any such maintenance, repairs, service or adjustment, or by any interruption of service or losses of use thereof or for any loss of business however caused. We shall not be liable for any special or consequential damages.

**LEASE SIGNATURE**
This lease is not binding until accepted by Lessor. You certify that all actions required to authorize the execution of this Lease, including your authority, have been fulfilled.

Authorized Signature: X _/s/ Y. Levitin_   Print Signer Name: Yelena Levitin
Signer Title: President   Date Signed: 5/15/17

**LEASE GUARANTY**
The undersigned personally guarantees that Lessee will make all payments and other charges required under this Lease when they are due and will perform all other obligations under this Lease. The undersigned waives any notification if the Lessee is in default and consents to any extensions and modifications granted to the Lessee. The undersigned agrees that We do not have to proceed against the Lessee, Equipment or other Guarantors. In the event of a default the undersigned will immediately pay in accordance with the default provision of this Lease Agreement and all sums due under the terms of the Lease Agreement, including reasonable attorney's fees. The undersigned consents to personal jurisdiction, venue, choice of law and jury trial waiver as stated in the Lease.

Signed: X _/s/ Y. Levitin_   Print Name: Yelena Levitin   Date: 5/15/17
Signed: X ____   Print Name: ____   Date: ____

**DELIVERY AND ACCEPTANCE RECEIPT**
Lessee hereby acknowledges delivery and acceptance of the above Equipment on the date indicated below. Lessee does hereby certify to Lessor that: (a) all Equipment requested and listed above has been delivered to the Lessee; (b) that Lessee has fully inspected and examined: (c) the Equipment is in full compliance with the above description; (d) the Equipment is in good operating condition and repair; and (e) the Equipment will be used exclusively for business purposes. Lessor may, from time to time in its sole discretion, as part of an audit function, seek verification of the Lessee's receipt and acceptance of the Equipment, by conducting telephone verification with Lessee. During such telephone verification, Lessor shall, among other things, verify the Lessee's identity by confirmation of Lessee's social security number, federal identification number or other practical means, as applicable, and shall confirm delivery, inspection and acceptance of the Equipment. LESSEE FULLY AND FINALLY ACCEPTS THE EQUIPMENT AND AUTHORIZES PAYMENT BY LESSOR TO THE SUPPLIER OF THE EQUIPMENT.

Date of Delivery: ____   Signature: X _Yelena Levitin_   Title: President

| INTERNAL USE ONLY | ACCEPTED FIRSTLEASE, INC. _Jaime Weinstein_ | Title: President | Date: 7/3/17 |
|---|---|---|---|

Page 1 of 2



EXHIBIT C



Effective Date: 7/3/17   Contract No.: 29473

1 Walnut Grove Drive, Suite 300, Horsham, PA 19044
Phone: 866-493-4778 • Fax: 215-283-9870 • www.firstleaseonline.com

8. **Waivers.** To the extent permitted by applicable law, You waive any and all rights and remedies You have by Sections 2A (Sections 508-522) of the UCC, including, but not limited to Your rights to: (a) cancel or repudiate this Lease (b) reject or revoke acceptance of the Equipment; (c) recover damages from Us for any breach of warranty or for any other reason, (d) deduct all or part of any claimed damages resulting from Our default, if any, under this Lease; (e) accept partial delivery of the Equipment. To the extent permitted by applicable law, You also waive any right now or hereafter conferred by statute or otherwise which may require Us to sell, lease or otherwise use any Equipment in mitigation of Our damages or which may otherwise limit or modify any of Our rights or remedies. Any action by You against Us for any default by Us under this Lease, including breach of warranty or indemnity, must be commenced within one (1) year after the events giving rise to the cause of action occur, otherwise the right to bring such action shall be waived.

9. **Equipment Use, Location and Service.** YOU PROMISE THAT THE EQUIPMENT WILL BE USED ONLY FOR BUSINESS AND NOT FOR PERSONAL, FAMILY OR HOUSEHOLD USE. The equipment shall not be removed from the location it was delivered to without our prior express written consent. You shall keep and maintain the Equipment, at your expense, in as good operating condition as when it was delivered with reasonable wear and tear from proper use expected. You will provide all maintenance, service, repairs, and replacements as reasonably necessary. We shall have the right to inspect the Equipment at any time.

10. **Loss; Damage; Insurance.** You shall, at all times during this Lease, (a) bear the risk of loss, theft, destruction, and damage of the Equipment or any portion thereof from any cause whatsoever, (b) keep the Equipment insured against all risks of damage and loss in an amount equal to its replacement cost, with Us named as sole "loss payee," and (c) carry liability insurance covering bodily injury and property damage in an amount acceptable to Us, with Us named as "additional insured." You shall provide Us with evidence of such insurance containing other terms acceptable to Us ("Insurance Proof") within 30 days of the Effective Date. If you fail to provide Insurance Proof, or if such insurance terminates for any reason, then (i) We have the right, but not the obligation, to obtain such insurance in such forms and amounts from an insurer of Our choosing ("Other Insurance"), and (ii) You agree to pay a periodic charge for such Other Insurance. This periodic charge will include reimbursement for premiums advanced by Us, billing and tracking fees, charges for Our processing and related fees, and a finance charge of up to 18% per annum (or the maximum allowed by law, if less) on any advances We make for premiums (collectively, the "Insurance Charge"). We and/or one or more of our affiliates and/or agents may receive a portion of the Insurance Charge, which may include a profit. We are not obligated to obtain, and may cancel, Other Insurance at any time without notice to You. Any Other Insurance need not name You as an insured or protect Your interests. The Insurance Charge may be higher than the cost to You if You obtained insurance on Your own.

11. **Indemnity.** You agree to indemnify and hold Us, Our successors and assigns harmless from all liabilities, obligations, losses, damages and claims and all costs and expenses thereof (including legal fees and expenses) of any kind relating to or arising out of the Equipment, including, without limitation, the manufacture, purchase, lease, ownership, delivery, installation, maintenance, possession, operation, condition, storage, return or use of the Equipment, howsoever arising. The provisions of this paragraph shall survive the expiration or termination of this Lease.

12. **Taxes.** You must pay us for all sales, use, property and other taxes (and any penalties) relating to the Lease and the Equipment. We may adjust this Lease and the payment above to finance for you any taxes and fees due at Lease inception. We may bill you based on the estimate of the taxes and fees. We may charge you an annual property tax administration fee up to $25 for each year of the Lease.

13. **Default.** You shall be in default of this Lease upon the occurrence of any one of the following ("Event of Default"): (a) You fail to pay when due any Lease payments or other payment required by this Lease; (b) You fail to obtain and maintain any insurance required pursuant to this Lease; (c) You or any guarantor of this Lease ("Guarantor") fails to perform or observe any provision, covenant or condition under this Lease, any Guaranty, or any other lease or agreement You or Guarantor may have with Us; (d) a petition is filed by You or Guarantor under any bankruptcy, insolvency, receivership or similar proceeding. You or Guarantor makes an assignment for the benefit of creditors or is otherwise unable to pay its debts as they become due; (e) a petition is filed against You or Guarantor under any bankruptcy, insolvency, receivership or similar proceeding which is not dismissed within sixty (60) days of the date of filing; (f) any representation or warranty or credit information provided by You or Guarantor to Us is incorrect in any material respect; (g) You or Guarantor winds up, dissolves or otherwise terminates its business, consolidates or merges with another entity, or sells, leases or otherwise transfers all or substantially all of its assets to any entity; (h) the Equipment or any of Your property is attached, seized, levied or executed upon or is subject to any judgment, writ or warrant; (i) You make or permit any unauthorized assignment or transfer of this Lease, the Equipment or any interest therein; (j) there is a default with respect to any guaranty executed by Guarantor in connection with this Lease, or (k) We deems ourselves insecure due to any change in Your business, manner of operation or financial condition.

14. **Remedies.** The occurrence of an Event of Default by You relating to this Lease shall entitle Us to exercise the rights and remedies set forth below. The exercise of any one or more of such remedies shall not preclude Us from any other remedies available to Us under this Lease. Upon the occurrence of any Event of Default We may: ( a) without court order or prior notice, enter any premises where the Equipment is located and disconnect, de-install and repossess any or all of the Equipment or render the Equipment unusable, without liability to You for any damages occasioned by such actions; (b) sell or otherwise dispose of any or all of the Equipment at public or private sale, with or without notice, advertisement or publication, may re-lease any or all of the Equipment or may use, hold or keep the Equipment; (c) charge you interest on all monies due at the rate of 18% per annum or the highest rate permitted by law from the date of default (d) declare immediately due and payable all sums due and to become due for the full remaining term (including any purchase options You have contracted to pay); (e) with or without terminating this Lease, recover from You damages, not as a penalty, but herein liquidated for all purposes and in an amount equal to the sum of (i) any accrued and unpaid Lease payments as of the date of entry of judgment in favor of Us plus late charges and all other sums that may accrue hereunder, (ii) the present value of all unpaid future payments reserved in the Lease and contracted to be paid over the unexpired term of the Lease discounted at a rate equal to the discount rate of the Federal Reserve Bank of Philadelphia as of the date of entry of judgment in favor of Us plus one percent (1%), and (iii) all commercially reasonable costs and expenses incurred by Us in any repossession, recovery, storage, repair, sale, re-lease or other disposition of the Equipment including reasonable attorneys' fees of twenty percent (20%) but in no event less than one thousand dollars ($1,000.00), and costs incurred in connection therewith or otherwise resulting from Your default (inclusive of fees of collection agencies, overnight delivery charges, certified mail costs, long distance telephone charges and site inspections and other costs incurred in the collection of the balance due); and (f) exercise any other right or remedy which may be available to it under any other applicable law. No remedy referred to in this Paragraph is intended to be exclusive, but shall be cumulative and in addition to any other remedy referred to above or otherwise available to Us in law or in equity, by statute or otherwise, and may be exercised or enforced concurrently therewith or from time to time.

15. **Notices.** Any notice required to be given pursuant to this Lease shall be in writing and sent by certified mail or nationally recognized overnight courier service with confirmed delivery to the party's principal place of business designated herein, or to such other address as the party shall designate in writing to the other party, and shall be effective as of the third business day after date of mailing or the date of confirmed delivery.

16. **Validity.** If any portion of this Lease is found to be invalid or unenforceable, such invalidity or unenforceability shall not affect the remaining portions of this Lease, which shall remain in full force and effect and to this end those provisions are deemed severable.

17. **Assigns.** This Lease is binding upon the parties hereto, their respective agents, successors, legal representatives and permitted assigns.

18. **Law and Jurisdiction.** You acknowledge and agree that this Lease was negotiated, accepted and executed in Montgomery County, Pennsylvania. Accordingly, this Lease and the rights and duties of the parties hereunder shall be governed by and construed pursuant to Pennsylvania law. All disputes arising out of this Lease shall be, at Our option, subject to the exclusive jurisdiction and venue of the Court Of Common Pleas of Montgomery County or the United States District Court for the Eastern District of Pennsylvania, and the parties consent to the personal and exclusive jurisdiction of these courts. You further waive any objections You may have as to proper venue or forum non-convenience or similar claims with respect to the jurisdiction and venue of such courts.

19. **Waiver of Jury Trial.** YOU HEREBY WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO WHICH THE LESSEE AND LESSOR MAY BE PARTIES ARISING OUT OF OR IN ANY WAY PERTAINING TO THIS LEASE. This waiver is knowingly, willingly and voluntarily made by You and You hereby acknowledge that no representation of fact or opinion has been made by Us to induce this waiver of trial by jury or in any way to modify or nullify its effect. You further acknowledge that You has been represented in the signing of this Lease and waiver by independent legal counsel, selected of Your own free will, and that You have had the opportunity to discuss this waiver with counsel, or have voluntarily waived such right.

20. **Purchase Option.** Provided you are not in default, You may purchase all the Equipment (not part) for the purchase option price shown on the front page of this Lease, plus tax and an end of lease processing fee of $99.00. We will then transfer title to the Lessee "AS IS/WHERE IS" without warranties of any kind. We will use Our best judgment as to FMV. If You do not agree, We will hire an appraiser, at Your expense, whose valuation will be binding.

21. **Renewal.** If the purchase option price is Fair Market Value (FMV), renewal of this Lease will be automatic, on a monthly basis, unless you deliver to Us written notice, at least sixty (60) days prior to the expiration of the term or renewal term, of Your intention to return the Equipment to Us. And at the expiration of the Lease term or other termination, You immediately return the Equipment at Your expense, in good condition and working order, to such a place designated by Us. You must pay any additional Lease payment (s) due, plus a restocking fee of $200.00, until the Equipment is returned.

_____ Initials

## Equipment Finance Agreement

EFA No. 02086-001L

Between AILCO EQUIPMENT FINANCE GROUP, INC. (the "Creditor")
W222 N833 Cheaney Dr., Waukesha, WI 53186
And Chicago Surgical Clinic, LTD. (the "Debtor")
Debtor Address: 129 W. Rand Rd. City: Arlington Heights State: IL Zip: 60004

This Equipment Finance Agreement (the "EFA") is made and entered into by and between the Creditor and Debtor identified above. If more than one party executes this EFA as Debtor, each shall be jointly and severally liable hereunder.

| FULL DESCRIPTION OF COLLATERAL INCLUDING MAKE, MODEL & SERIAL NUMBERS: |
|---|
| (3) Philips Burton AIM LED Single Ceiling Procedure Light, 3 LED Modules, 45,000 LUX @ 1 Meter, 4300 K, 5 Yr Limited Warranty, 120 V |
| (1) Philips Burton AIM LED Dual, Ceiling Mount Procedure Light, 120 V, 3 LED modules, 45,000 LUX @ 1 Meter\Head, 4300 K, 5 Yr Limited Warranty |
| (1) Tuttnauer EZ Automatic Autoclave with Printer, Closed Door Drying, 10" X 19" Chamber, 3 Programmable Cycles, Auto Off with Purge, 120 V |

| COLLATERAL LOCATION: 129 W. Rand Rd., Arlington Heights, IL 60004 | | |
|---|---|---|
| TERM OF EFA: 60 Months | NUMBER OF PAYMENTS: 60 | MONTHLY PAYMENT:<br>1 @ $485.00<br>5 @ $115.00<br>53 @ $370.00<br>1 @ $0.00 |
| EFA AMOUNT: $16,971.00 | | EFA COMMENCEMENT DATE: 5/15/15 |

### Terms of the Equipment Finance Agreement

Debtor and Creditor agree as follows:

1. SECURITY INTEREST. Debtor hereby grants Ailco Equipment Finance Group, Inc. ("Creditor") a security interest under the Uniform Commercial Code in the above property (collectively the "Collateral" and individually as "Item" or "Item of Collateral"). Such security interest is granted to secure performance by Debtor of its obligations hereunder and under any other present or future agreement with Creditor. Debtor shall insure that such security interest is and shall remain a sole first lien security interest. DEBTOR HEREBY AUTHORIZES CREDITOR TO FILE A COPY OF THIS AGREEMENT (IF APPROPRIATE) AS A FINANCING STATEMENT AND APPOINTS CREDITOR OR ITS DESIGNEE AS DEBTOR'S ATTORNEY-IN-FACT TO EXECUTE AND FILE, ON DEBTOR'S BEHALF, ANY FINANCING STATEMENT(S) COVERING THE COLLATERAL DEEMED APPROPRIATE BY CREDITOR.

2. PAYMENTS. Debtor agrees to and shall repay Creditor the above payments in the number of monthly installments of the amount indicated above. The initial installment payment shall be deemed due as of the date indicated above and subsequent installment payments shall be due on the same day of each subsequent month until all payments are made. A prorata portion of the installment payment based on a daily charge of one-thirtieth (1/30) of the monthly payment calculated from the acceptance date to the commencement date shall be due and payable at the EFA commencement date. All other amounts due thereunder shall be due upon Debtor's receipt of Creditor's invoice/coupon therefor. Advance payments shall be applied to the last installment payments in reverse order until exhausted; provided that if there is a default, any payments under this agreement may be applied to Debtor's obligations to Creditor in such order as Creditor chooses.

3. NO AGENCY. DEBTOR ACKNOWLEDGES THAT NO SUPPLIER OF ANY ITEM OR INTERMEDIARY NOR ANY AGENT OF EITHER THEREOF IS AN AGENT OF CREDITOR AND FURTHER THAT NONE OF SUCH PARTIES IS AUTHORIZED TO WAIVE OR ALTER ANY ITEM OR CONDITION OF THIS AGREEMENT. NO REPRESENTATION AS TO ANY MATTER BY ANY SUCH PARTY SHALL BIND CREDITOR OR AFFECT DEBTOR'S DUTY TO PAY THE INSTALLMENT PAYMENTS AND PERFORM ITS OTHER OBLIGATIONS HEREUNDER.

4. NON CANCELABLE AGREEMENT; PREPAYMENT; NO OFFSET. THIS AGREEMENT IS NON CANCELABLE BY DEBTOR FOR ANY REASON WHATSOEVER. DEBTOR MAY REPAY THE INSTALLMENT PAYMENTS ONLY IN ACCORDANCE HEREWITH. ALL PAYMENTS, AND OBLIGATIONS FOR PAYMENT, BY DEBTOR HEREUNDER ARE TO BE MADE WITHOUT ANY OFFSET.

5. FINANCING, WARRANTIES, SOFTWARE & EXECUTION. THIS AGREEMENT IS SOLELY A FINANCING AGREEMENT. CREDITOR MAKES NO WARRANTY WITH RESPECT TO THE COLLATERAL, EXPRESS OR IMPLIED, OR THAT THE COLLATERAL IS FIT FOR A PARTICULAR PURPOSE OR THAT THE COLLATERAL IS MERCHANTABLE. DEBTOR AGREES THAT DEBTOR HAS SELECTED THE SUPPLIER AND EACH ITEM OF COLLATERAL BASED UPON DEBTOR'S OWN JUDGMENT AND DISCLAIMS ANY RELIANCE UPON ANY STATEMENTS OR REPRESENTATIONS MADE BY CREDITOR. CREDITOR DOES NOT TAKE RESPONSIBILITY FOR THE INSTALLATION OR PERFORMANCE OF THE COLLATERAL. THE SUPPLIER IS NOT AN AGENT OF CREDITOR AND NOTHING THE SUPPLIER STATES CAN AFFECT DEBTOR'S OBLIGATION UNDER THE AGREEMENT. DEBTOR WILL CONTINUE TO MAKE ALL PAYMENTS UNDER THIS AGREEMENT REGARDLESS OF ANY CLAIM OR COMPLAINT AGAINST SUPPLIER OR ANY OTHER PARTY.

DocuSign Envelope ID: 0DEBB4D0-B8D3-4A7B-826E-C487E1A474B8

THIS IS A COPY
This is a copy view of the Authoritive Copy held by the designated custodian

# MARLIN — EQUIPMENT LEASE AGREEMENT

| Marlin ("We" or "Us"): | ☐ Marlin Leasing Corporation - Healthcare Division<br>300 Fellowship Rd · Mt. Laurel, NJ 08054<br>phone: 888.479.9111 · fax: 888.479.1100 | or ☐ Marlin Business Bank<br>P.O. Box 1626 · Mt. Laurel, NJ 08054<br>phone: 801.453.1722 |
|---|---|---|

www.marlinfinance.com

**DESCRIPTION OF LEASED EQUIPMENT ("PRODUCTS")** (Include quantity, make, model, serial number and accessories. Attach schedule if necessary.) — **MUST BE COMPLETED**

Stryker 1288 Camera    App # 1208033

**CUSTOMER ("YOU")**

Company Name (Exact business name): Chicago Surgical Clinic, Ltd.

Address: 129 W. Rand    Arlington Heights    IL    60004
(Street / City / State / Zip)

Phone: 8472150530    Email:    Federal Tax ID: 364479531    ☒ Corp.  ☐ LLC  ☐ Partnership  ☐ Prop.

Product Location: 129 W. Rand, Arlington Heights, IL 60004    State of Incorporation/Organization:

Vendor: Advanced Surgical Services LLC    Address: 6714 Tree Knoll, Troy, MI 48908

| Lease Term (Mos.) | Total No. of Payments | Amount of Each Pymt. | Advance Rentals | Security Deposit | Payment Frequency | Purchase Option |
|---|---|---|---|---|---|---|
| 66 | 66 | See Schedule "B" (plus applicable taxes) | $0.00 First and Last month(s) | $0.00 | See Schedule "B" | $1.00 |

**TERMS OF AGREEMENT BELOW - TO REVIEW THE USPA FEDERAL LAW DISCLOSURE – PLEASE VISIT: www.marlinfinance.com/USPA**

1. You want to acquire the Products from the above vendor. You want Marlin to buy them and lease them to you. This Agreement will begin when the Products are delivered to you and will continue for the entire Agreement Term plus any interim period. You will unconditionally pay us all amounts due, without any right to set-off. If we do not receive your Payment by its due date, there will be a late fee equal to 15% of the late amount (or, if less, the maximum amount allowable under law) which you agree is a reasonable estimate of the costs we incur with respect to late Payments and is not a penalty. Upon your request, we will waive the first assessed late charge. We may charge you (i) a partial Payment (interim rent) for the time between delivery and the due date for the first regular Payment and (ii) a one-time documentation fee up to $350. You agree that we may adjust the Payment amount if the final Products cost varies by up to 15% from the amount the Payment was based upon. This Agreement is not binding on us until we sign it. You agree a scanned, facsimile, or electronic copy of this Agreement and of your signature will be considered as good as an original and admissible in court as conclusive evidence of this Agreement. Our copy of this Agreement will be deemed chattel paper and evidence your monetary obligation to us.

2. (a) You may purchase all of the Products for the above Purchase Option amount. Unless your Purchase Option is $1.00, you will give us written notice between 60 and 90 days before the expiration of the Initial Agreement Term (or any renewal term) of your intention to return or purchase the Products. After you have (i) paid all amounts owing under the Agreement and (ii) given us the proper and timely notice, then at the end of the Agreement Term, you shall return the Products pursuant to the instructions we provide to you. You agree to reimburse us for our costs to refurbish returned Products for damage beyond normal wear and tear. You are solely responsible for removing all data/images stored on the Products prior to the Products return. If you fail to notify us as provided herein, this Agreement will extend on a month to month basis, until you have given at least 60 days written notice of your intention to return or purchase the Products. (b) You have paid us one or more advance payments and/or a security deposit in the amount(s) indicated above. If the Agreement does not commence for reasons other than our own negligence, we may retain such monies to compensate us for our credit and other administrative costs. You agree the security deposit will not bear interest and that we may apply it to any amount owed to us, and if we do so, you agree to restore it to its original amount. You may request the return of the security deposit only after all of your obligations under this Agreement have been met in full.

3. You alone selected the vendor and the Products. You asked us to buy the Products. We are not related to the vendor and we cannot get a refund, nor is the vendor allowed to waive or modify any term of this Agreement. Therefore, the Agreement cannot be canceled by you for any reason, even if the Products fail or are damaged and it is not your fault. We are leasing it to you "as is" and we disclaim all express and implied warranties, including any warranty of merchantability or fitness for a particular purpose. You are responsible for installation and all service. The vendor may have given you warranties. You may contact the vendor to get a statement of any warranties. We assign to you any warranties the vendor may have given you. You shall settle any dispute regarding the Products performance directly with the vendor. You promise that the Products will be used only for business and not for personal, family or household purposes. You will keep and use the Products only at the above address, not move or return them prior to the end of the Agreement Term, and will not allow the Products to be used outside of the United States. Your Payment may include amounts you owe to the vendor under a separate maintenance, service and/or supply arrangement. We may invoice such amounts on the vendor's behalf for your convenience. You agree that any claims related to maintenance, service or supplies will not impact your obligation to pay us the full amount due under this Agreement. You agree that as to any software: we have not had, do not have, nor will have any title to such software but will have all rights of a secured party under the UCC and a continuing security interest in the license.

4. You will be in default under this Agreement if any of the following occur: (a) you fail to make any Payment or fail to pay any other amount due under this Agreement by its due date; (b) you fail to comply with any other term or condition of this Agreement or any other agreement between us, or fail to perform any obligation imposed upon you relating to this Agreement or any such other agreement; or (c) you become deceased (if the Customer entity under this Agreement is one or more natural persons), go out of business, admit your inability to pay your debts as they fall due, become insolvent, make an assignment for the benefit of your creditors, file (or have filed against you) a petition in bankruptcy, a trustee or receiver of your business assets is appointed, or you sell all or substantially all of such assets; (d) you allow a controlling interest in the Customer (you) to be sold, transferred, or assigned to any person(s) or entity(ies) other than those who hold a controlling interest as of the date hereof whether by merger, sale or otherwise; (e) you enter into any merger or reorganization in which the Customer is not the surviving entity; or (f) you allow a Blocked Person to have ownership interest in or control of Customer. "Blocked Person" means any person or entity that is now or at any time (A) on a list of Specially Designated Nationals issued by the Office of Foreign Assets Control ("OFAC") of the United States Department of the Treasury or any sectoral sanctions identification list, or (B) whose property or interests in property are blocked by OFAC or who is subject to sanctions imposed by law, including any executive order of any branch or department of the United States government or (C) otherwise designated by the United States or any regulator having jurisdiction or regulatory oversight over Marlin, to be a person with whom Marlin is not permitted to extend credit to or with regard to whom, a Customer relationship may result in penalties against Marlin or limitations on a lender's ability to enforce a transaction.

5. In the event you default under this Agreement, as defined above, we will have the right to take ANY OR ALL of the following actions in addition to any and all other remedies that may be available to us under law: (i) you authorize us to debit, via the ACH system, any Payment(s) due or amounts owed to us (including the Lender's Loss) from any bank account(s) we have on file for you or that you may provide us with from time to time (and in our doing so, you agree to be bound by NACHA Operating Rules); and/or (ii) repossess or dispose the Products, and/or (iii) file a lawsuit against you to collect the Lender's Loss. The "Lender's Loss" means the sum of (1) all past due rent then due, plus (2) all rent that will become due in the future during the unexpired term discounted from the dates the respective Payments would be due at a discounted rate of 6% per annum, plus (3) the "residual value" of the Product as determined by us in our sole but reasonable judgment, plus (4) all other fees, charges, taxes or amounts that are then due. You agree to pay all of our reasonable legal costs, including but not limited to reasonable attorney's fees, and reasonable overhead for employee time spent on preparing for suit or attempting to collect Payments. You agree to pay (i) a convenience fee for any Payment you elect to make by telephone and (ii) a charge of $30 if any Payment made by ACH or check is dishonored or returned. **This Agreement shall be governed by the laws of the Commonwealth of Pennsylvania (where we have an office and accepted this Agreement). You agree that any suit relating to this Agreement shall be brought in a state or federal court in Pennsylvania. You irrevocably consent and submit to the jurisdiction of such courts, and you waive any claim that any such court is an inconvenient or improper forum. Each party waives any right to a jury trial.** We will have title to the Product at all times. This is a "true lease" and not a loan or installment sale. You grant us a first priority security interest in the Products and authorize us to file Uniform Commercial Code ("UCC") financing statements (in case this is later determined not to be a "true lease"). You agree this is a "finance lease" under Article 2A of the UCC. You waive all UCC rights and remedies you may have, including those in Sections 2A-508 through 2A-522.

6. You must pay us for all sales, use, property and other taxes relating to the Agreement and the Products. We may adjust this Agreement and the Payment to finance for you any taxes and fees due at Agreement inception. We may bill you based on our estimate of the taxes and fees. We may charge you an annual property tax administration fee up to $25. Unless we have given you a written option to buy the Products at the end of the Agreement Term for $1.00, we will be entitled to all tax benefits. If you do anything to disallow our getting these benefits, you will promptly indemnify (pay) us an equivalent amount. If we gave you a $1.00 purchase option, we may require you to file all personal property tax returns. You accept all risks of loss, injury or damage caused by the Products and shall indemnify us for all suits and other liabilities arising from the same. This indemnity will continue even after the Agreement has ended. You must maintain acceptable liability insurance naming us as "additional insured". You must keep the Products insured against all risks of loss in an amount equal to the replacement cost and have us listed on the policy as "loss payee." If you do not give us proof of the required insurance within 30 days after the Agreement commences, then depending on the original Products cost we may, but are not obligated to, obtain insurance to cover our interests and charge you a fee for such coverage (including a monthly administration fee and a profit to us). You can cancel the insurance coverage fee at any time by delivering the required proof of insurance.

7. You may not sell, transfer, assign or sublease the Products or Agreement to anyone else without our prior written approval. You agree to keep the Products free and clear of all liens and claims. We may sell or transfer our interests to another entity, who will then have all of our rights but none of our obligations. Those obligations will continue to be ours. The rights we pass on to the new entity will not be subject to any defenses, claims or set-offs you may assert against us. All prior conversations, agreements and representations relating to this Agreement or Products are integrated herein. None of the terms of this Agreement shall be changed or modified except in writing duly executed by you and us. Any action by you against us must be commenced within one year after the cause of action arises or be forever barred. Time is of the essence with respect to the obligations of Customer under this Agreement. Any provision of this Agreement that is unenforceable in any jurisdiction shall, as to the jurisdiction, be ineffective to the extent of such unenforceability without invalidating the remaining provisions of this Agreement, and any such unenforceability in any jurisdiction shall not render unenforceable that provision in any other jurisdiction.

**ACCEPTANCE OF LEASE AGREEMENT** — THIS IS A BINDING CONTRACT. IT CANNOT BE CANCELED. READ IT CAREFULLY BEFORE SIGNING AND CALL US IF YOU HAVE ANY QUESTIONS.

| X /s/ Yelena Levitin | Yelena Levitin | President | 6/15/2017 |
|---|---|---|---|
| Signature of Leasing Customer | Print Name of Signer | Title | Date |

| Accepted and Signed by Marlin | Print Name of Signer | Title | Date |
|---|---|---|---|

**ACCEPTANCE OF DELIVERY**

I CERTIFY THAT THE PRODUCTS ARE DELIVERED, INSTALLED AND WORKING PROPERLY. I AUTHORIZE MARLIN TO PAY THE VENDOR AND COMMENCE THIS AGREEMENT.

X /s/ Yelena Levitin    Yelena Levitin    President

Authorized Signature    Name and Title (Please Print)    Product Delivery Date

LCM-0001-03.2017

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

# MARLIN — EQUIPMENT LEASE AGREEMENT

Marlin ("We" or "Us"): ☐ Marlin Leasing Corporation - Healthcare Division
300 Fellowship Rd · Mt. Laurel, NJ 08054
phone: 888.479.9111 · fax: 888.479.1100
www.marlinfinance.com

or ☐ Marlin Business Bank
P.O. Box 1626 · Mt. Laurel, NJ 08054
phone: 801.453.1722

## DESCRIPTION OF LEASED EQUIPMENT ("PRODUCTS") (include quantity, make, model, serial number and accessories. Attach schedule if necessary.)  **MUST BE COMPLETED**

Sterlizer

App # 1207764

## CUSTOMER ("YOU")

Company Name (Exact business name): Chicago Surgical Clinic LTD

Address: 129 W. Rand Rd — Street; Arlington Heights — City; County; IL — State; 60004 — Zip

Phone: 8472150530   Email: ___   Federal Tax ID: ___   ☒ Corp.  ☐ LLC  ☐ Partnership  ☐ Prop.

Product Location: 129 W Rand Rd, Arlington Heights, IL 60004         State of Incorporation/Organization: ___

Vendor: Steris Corporation         Address: 5960 Heisley Rd, Mentor, OH 44060

| Lease Term (Mos.) | Total No. of Payments | Amount of Each Pymt. | Advance Rentals | Security Deposit | Payment Frequency | Purchase Option |
|---|---|---|---|---|---|---|
| 66 | 66 | See Schedule "B" (plus applicable taxes) | $0.00 First and Last month(s) | $0.00 | See Schedule "B" | $1.00 |

**TERMS OF AGREEMENT BELOW - TO REVIEW THE USPA FEDERAL LAW DISCLOSURE – PLEASE VISIT: www.marlinfinance.com/USPA**

1. You want to acquire the Products from the above vendor. You want Marlin to buy them and lease them to you. This Agreement will begin when the Products are delivered to you and will continue for the entire Agreement Term plus any interim period. You will unconditionally pay us all amounts due, without any right to set-off. If we do not receive your Payment by its due date, there will be a late fee equal to 15% of the late amount (or, if less, the maximum amount allowable under law) which you agree is a reasonable estimate of the costs we incur with respect to late Payments and is not a penalty. Upon your request, we will waive the first assessed late charge. We may charge you (i) a partial Payment (interim rent) for the time between delivery and the due date for the first regular Payment and (ii) a one-time documentation fee up to $350. You agree that we may adjust the Payment amount if the final Products cost varies by up to 15% from the amount the Payment was based upon. This Agreement is not binding on us until we sign it. You agree a scanned, facsimile, or electronic copy of this Agreement and of your signature will be considered as good as an original and admissible in court as conclusive evidence of this Agreement. Our copy of this Agreement will be deemed chattel paper and evidence your monetary obligation to us.

2. (a) You may purchase all of the Products for the above Purchase Option amount. Unless your Purchase Option is $1.00, you will give us written notice between 60 and 90 days before the expiration of the initial Agreement Term (or any renewal term) of your intention to return or purchase the Products. After you have (i) paid all amounts owing under the Agreement and (ii) given us the proper and timely notice, then at the end of the Agreement Term, you shall return the Products pursuant to the instructions we provide to you. You agree to reimburse us for our costs to refurbish returned Products for damage beyond normal wear and tear. You are solely responsible for removing all data/images stored on the Products prior to the Products return. If you fail to notify us as provided herein, this Agreement will extend on a month to month basis, until you have given at least 60 days written notice of your intention to return or purchase the Products. (b) You have paid us one or more advance payments and/or a security deposit in the amount(s) indicated above. If the Agreement does not commence for reasons other than our own negligence, we may retain such monies to compensate us for our credit and other administrative costs. You agree the security deposit will not bear interest and that we may apply it to any amount owed to us, and if we do so, you agree to restore it to its original amount. You may request the return of the security deposit only after all of your obligations under this Agreement have been met in full.

3. You alone selected the vendor and the Products. You asked us to buy the Products. We are not related to the vendor and we cannot get a refund, nor is the vendor allowed to waive or modify any term of this Agreement. Therefore, the Agreement cannot be canceled by you for any reason, even if the Products fail or are damaged and it is not your fault. We are leasing it to you "as is" and we disclaim all express and implied warranties, including any warranty of merchantability or fitness for a particular purpose. You are responsible for installation and all service. The vendor may have given you warranties. You may contact the vendor to get a statement of any warranties. We assign to you any warranties the vendor may have given us. You shall settle any dispute regarding the Products performance directly with the vendor. You promise that the Products will be used only for business and not for personal, family or household purposes. You will keep and use the Products only at the above address, not move or return them prior to the end of the Agreement Term, and will not allow the Products to be used outside of the United States. Your Payment may include amounts you owe to the vendor under a separate maintenance, service and/or supply arrangement. We may invoice such amounts on the vendor's behalf for your convenience. You agree that any claims related to maintenance, service or supplies will not impact your obligation to pay us the full amount due under this Agreement. You agree that as to any software: we have not had, do not have, nor will have any title to such software but will have all rights of a secured party under the UCC and a continuing security interest in the license.

4. You will be in default under this Agreement if any of the following occur: (a) you fail to make any Payment or fail to pay any other amount due when due by its due date; (b) you fail to comply with any other term or condition of this Agreement or any other agreement between us, or fail to perform any obligation imposed upon you relating to this Agreement or any such other agreement; or (c) you become deceased (if the Customer entity under this Agreement is one or more natural persons), go out of business, admit your inability to pay your debts as they fall due, become insolvent, make an assignment for the benefit of your creditors, file (or have filed against you) a petition in bankruptcy, a trustee or receiver of your business assets is appointed, or you sell all or substantially all of such assets; (d) you allow a controlling interest in the Customer (you) to be sold, transferred, or assigned to any person(s) or entity(ies) other than those who hold a controlling interest as of the date hereof whether by merger, sale or otherwise; (e) you enter into any merger or reorganization in which the Customer is not the surviving entity; or (f) you allow a Blocked Person to have ownership interest in or control of Customer. "Blocked Person" means any person or entity that is now or at any time (A) on a list of Specially Designated Nationals issued by the Office of Foreign Assets Control ("OFAC") of the United States Department of the Treasury or any sectoral sanctions identification list, or (B) whose property or interests in property are blocked by OFAC or who is subject to sanctions imposed by law, including any executive order of any branch or department of the United States government or (C) otherwise designated by the United States or any regulator having jurisdiction or regulatory oversight over Marlin, to be a person with whom Marlin is not permitted to extend credit to or with regard to whom, a Customer relationship may result in penalties against Marlin or limitations on a lender's ability to enforce a transaction.

5. In the event you default under this Agreement, as defined above, we will have the right to take ANY OR ALL of the following actions, in addition to any and all other remedies that may be available to us under law (i) you authorize us to debit via the ACH system, any Payment(s) due or amounts owed to us (including the Lender's Loss) from any bank account(s) we have on file for you or that you may provide us with from time to time (and in our doing so, you agree to be bound by NACHA Operating Rules), and/or (ii) repossess or deem the Products, and/or (iii) file a lawsuit against you to collect the Lender's Loss. The "Lender's Loss" means the sum of (1) all past due rent then due, plus (2) all rent that will become due in the future during the unexpired term discounted from the dates the respective Payments would be due at a discounted rate of 3% per annum, plus (3) the "residual value" of the Product as determined by us in our sole but reasonable judgment, plus (4) all other fees, charges, taxes or amounts that are then due. You agree to pay all of our reasonable legal costs, including but not limited to reasonable attorney's fees, and reasonable overhead for employee time spent on preparing for suit or attempting to collect Payments. You agree to pay (i) a convenience fee for any Payment you elect to make by telephone and (ii) a charge of $30 if any Payment made by ACH or check is dishonored or returned. This Agreement shall be governed by the laws of the Commonwealth of Pennsylvania (where we have an office and accepted this Agreement). You agree that any suit relating to this Agreement shall be brought in a state or federal court in Pennsylvania. You irrevocably consent and submit to the jurisdiction of such courts, and you waive any claim that any such court is an inconvenient or improper forum. Each party waives any right to a jury trial. We will have title to the Product at all times. This is a "true lease" and not a loan or installment sale. You grant us a first priority security interest in the Products and authorize us to file Uniform Commercial Code ("UCC") financing statements (in case this is later determined not to be a "true lease"). You agree this is a "finance lease" under Article 2A of the UCC. You waive all UCC rights and remedies you may have, including those in Sections 2A-508 through 2A-522.

6. You must pay us for all sales, use, property and other taxes relating to the Agreement and the Products. We may adjust this Agreement and the Payment to finance for you any taxes and fees due at Agreement inception. We may bill you based on our estimate of the taxes and fees. We may charge you an annual property tax administration fee up to $25. Unless we have given you a written option to buy the Products at the end of the Agreement Term for $1.00, we will be entitled to all tax benefits. If you do anything to disallow our getting these benefits, you will promptly indemnify (pay) us an equivalent amount. If we gave you a $1.00 purchase option, we may require you to file all personal property tax returns. You accept all risks of loss, injury or damage caused by the Products and shall indemnify us for all suits and other liabilities arising from the same. This indemnity will continue even after the Agreement has ended. You must maintain acceptable liability insurance naming us as "additional insured". You must keep the Products insured against all risks of loss in an amount equal to the replacement cost and have us listed on the policy as "loss payee." If you do not give us proof of the required insurance within 30 days after the Agreement commences, then depending on the original Products cost we may, but are not obligated to, obtain insurance to cover our interests and charge you a fee for such coverage (including a monthly administration fee and a profit to us). You can cancel the insurance coverage fee at any time by delivering the required proof of insurance.

7. You may not sell, transfer, assign or sublease the Products or Agreement to anyone else without our prior written approval. You agree to keep the Products free and clear of all liens and claims. We may sell or transfer our interests to another entity, who will then have all of our rights but none of our obligations. Those obligations will continue to be ours. The rights we pass on to the new entity will not be subject to any defenses, claims or set-offs you may assert against us. All prior conversations, agreements and representations relating to this Agreement or Products are integrated herein. None of the terms of this Agreement shall be changed or modified except in writing duly executed by you and us. Any action by you against us must be commenced within one year after the cause of action arises or be forever barred. Time is of the essence with respect to the obligations of Customer under this Agreement. Any provision of this Agreement that is unenforceable in any jurisdiction shall, as to the jurisdiction, be ineffective to the extent of such unenforceability without invalidating the remaining provisions of this Agreement, and any such unenforceability in any jurisdiction shall not render unenforceable that provision in any other jurisdiction.

## ACCEPTANCE OF LEASE AGREEMENT   THIS IS A BINDING CONTRACT. IT CANNOT BE CANCELED. READ IT CAREFULLY BEFORE SIGNING AND CALL US IF YOU HAVE ANY QUESTIONS.

X _/s/ Yelena Levitin_   Yelena Levitin,   President   6/19/2017
Signature of Leasing Customer   Print Name of Signer   Title   Date

Accepted and Signed by the Lessor identified above   Print Name of Signer   Title   Date

## PRE-DELIVERY ACCEPTANCE

Per the arrangement with your Vendor, you hereby direct that we pay your Vendor for the Products, notwithstanding that you have not received some or all of the Products and/or not all of the Products have been installed (where applicable) and accepted by you. You agree that any issues you may have concerning the delivery, installation, implementation and/or quality of the Products will be resolved exclusively between you and the Vendor. Once you sign this Agreement and we accept it, we will commence the Agreement, your payment obligations to us under this Agreement are non-cancelable and irrevocable and you will be responsible to make all payments and comply with all other terms and conditions under the Agreement.

X _/s/ Yelena Levitin_   Yelena Levitin,   President
Authorized Signature   Name and Title (Please Print)   Product Delivery Date

LCM-0003-03.2017



*Wells Fargo Equipment Finance, Manufacturer Services Group*
300 Tri-State International, Suite 400 | Lincolnshire, IL 60069

March 23, 2015

Agreement Number: 301-0184909-001

Chicago Surgical Clinic Ltd
201 E Strong St
Ste 7
Wheeling, IL 60090

Equipment Description: 2-Harmony vLED Dual Light Packages, 2-Warming Cabinets Dual Compartments, 2-Single Compartments Warming Cabinets, 3-Vividimage D 27" HD Surgical Displays, Harmony EMS Ceiling systems, 2-Amsco 3085-General Surgical tables, 1-Flexmatic dual station Stainless steel scrub station

Enclosed please find the following required documents to be executed and returned to Wells Fargo Equipment Finance:

- Equipment Finance Agreement - 2 page with Personal guaranty of Yelena Levitin
- Bill To Ship To Information
- Step Payment Amendment
- Property Insurance
- Liability & Physical Damage Insurance Required

Please overnight original signed documents to the address below.

Manufacturer Services Group
Wells Fargo Bank, N.A.
Attn: Contracts Department
300 Tri-State International, Suite 400
Lincolnshire, IL 60069

Thank you for choosing Wells Fargo Equipment Finance for your financing needs. Please call Barbara Bird-Reed at 847-405-1427 if you have any questions regarding this documentation.

Sincerely,

Barbara Bird-Reed

© 2014 Wells Fargo Bank, N.A. All rights reserved. Wells Fargo Equipment Finance is the trade name for certain equipment leasing and finance businesses of Wells Fargo Bank, N.A. and its subsidiaries.
MSGT-COVERLETTER.0414:**BRINK**:03232015:1029:824896:2159949

# Single Sided Lease Agreement - $1 Purchase Option



*Wells Fargo Equipment Finance, Manufacturer Services Group*

300 Tri-State International, Suite 400 | Lincolnshire, IL 60069

| Lessee: | Chicago Surgical Clinic, Ltd. 201 E Strong Street, Suite 7 Wheeling, IL 60090 | | Agreement Number 301-0184909-002 | |
|---|---|---|---|---|

**Equipment Description:** Medical Gas Pipeline Equipment: 3) Pneumatic Retractable Ceiling Column Rough-In, 3) Pneumatic Retractable Ceiling Finished Assmebly

### Terms of Agreement

| Term in Months: | Lease Payment: | Advance Payment: | Remittance Period: | End Of Lease Purchase |
|---|---|---|---|---|
| 60 | $485.19 (plus applicable taxes) | N/A | Monthly | Option: $1.00 |

**1. Lease:** Lessee agrees to lease from the Lessor named below the equipment listed above and on any attached schedule (the "Equipment"). Lessee authorizes Lessor to adjust the Lease payments by up to 10% if the cost of the Equipment or taxes differs from the supplier's estimate. The Lease commences on the date that it is accepted by Lessor and Lease Payments shall start on that date or any later date designated by Lessor and are due thereafter on the first day of each consecutive remittance period at Lessor's office or such other place as Lessor may designate. Lessee's Lease obligations are absolute, unconditional, and are not subject to cancellation, reduction, setoff or counterclaim. Lessee agrees to pay a documentation fee of $100.00. When a payment is not made within five days when due, Lessee agrees to pay Lessor a late charge of 10% for each payment. LESSEE ACKNOWLEDGES THAT NO EQUIPMENT SUPPLIER IS AUTHORIZED TO CHANGE ANY TERM, PROVISION OR CONDITION OF THE LEASE.

**2. Equipment Use, Maintenance and Warranties:** Lessor is leasing the Equipment to Lessee "AS-IS" AND MAKES NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE. Lessor transfers to Lessee any manufacturer warranties. Lessee is required at its own cost to keep the Equipment repaired and maintained in good working order and as required by the manufacturer's warranty, certification and standard full service maintenance contract, and to pay for all supplies and repairs. If the Lease payment includes the cost of maintenance and/or service provided by a third party, Lessee agrees that Lessor is not responsible for performance under any agreement for the same. Lessee will make all claims about maintenance and service to the third party. Lessee agrees that any claims about maintenance or service will not impact its obligation to pay all Lease payments when due. Lessee acknowledges that Lessor is not the manufacturer's or supplier's agent, nor is the manufacturer or supplier an agent of Lessor.

**3. Assignment:** Lessee shall not (i) transfer, sell, sublease, assign, pledge, relocate, move or encumber either the Equipment or any rights under this Lease or (ii) consolidate or merge with any third party or transfer all or a material portion of its assets or ownership interests, without Lessor's prior written consent. Lessor may sell, assign, or transfer the Lease and the new owner will have the same rights and benefits of Lessor and will not have to perform any of Lessor's obligations and the rights of the new owner will not be subject to any claims, defenses, or setoffs that Lessee may have against Lessor or any supplier.

**4. Risk of Loss and Insurance:** Lessor is not responsible for any losses or injuries caused by the Equipment and Lessee will reimburse Lessor and defend Lessor against any such claims. This indemnity will continue after the termination of this Agreement. Lessee will obtain and maintain comprehensive public liability insurance naming Lessor as an additional insured with coverages and amounts acceptable to Lessor. Lessee is responsible for all risks of loss or damage to the Equipment and if any loss occurs, Lessee is required to satisfy all Agreement obligations. Lessee will keep the Equipment insured against all risks of loss or damage for an amount equal to its replacement cost. Lessee will list Lessor as the loss payee for the property insurance and provide written proof of the property insurance. If Lessee fails to provide proof of property insurance, or if such insurance terminates for any reason, then Lessor may elect to obtain such insurance on the Equipment at Lessee's expense. Lessee agrees that Lessor may charge Lessee a periodic charge for such insurance. This periodic charge will include reimbursement for premiums advanced by Lessor to purchase insurance, billing and tracking fees, charges for processing and related fees associated with other insurance, and a finance charge of up to 18% per annum (or the maximum rate allowed by law, if less) on any advances Lessor makes for premiums, (collectively, the "Insurance Charge"). Lessor and/or one or more of its affiliates and/or agents may receive a portion of the Insurance Charge, which may include a profit. Lessor is not obligated to obtain, and may cancel, the other insurance at any time without notice to Lessee. Any other insurance need not name Lessee as an insured or protect Lessee's interests. The Insurance Charge may be higher than if Lessee obtained insurance on its own.

**5. Taxes:** Lessee agrees to pay when due, either directly or as reimbursement to Lessor, all taxes (i.e. sales, use and personal property) and charges in connection with ownership and use of the Equipment. Lessor may charge Lessee a processing fee for administering property tax filings.

**6. End of Lease:** Provided Lessee is not in default and all charges under the Lease have been paid in full, Lessee may, exercise the option to purchase the Equipment under this lease for $1.00. If Lessee purchases the Equipment, it shall be after the end of the original lease term. Such purchase shall be in whole and not in part, and on an as-is, where-is basis without representations or warranties of any kind whatsoever.

**7. Default:** If Lessee fails to pay Lessor as agreed or breaches any other obligation under this Lease, Lessor will have the right to (i) sue Lessee for all past due payments and all payments to become due in the future for the unexpired term, plus the residual value Lessor has placed on the Equipment and other charges Lessee owes Lessor, and (ii) repossess the Equipment. Lessee will also pay for all reasonable attorney's fees and costs incurred by Lessor in connection with the collection or enforcement of the Lease.

**8. Miscellaneous:** THIS LEASE SHALL BE GOVERNED BY THE LAWS OF ILLINOIS. ANY LEGAL ACTION CONCERNING THIS LEASE SHALL BE BROUGHT IN A COURT LOCATED IN LAKE COUNTY, ILLINOIS. LESSOR AND LESSEE EACH IRREVOCABLY WAIVE ANY RIGHT TO A JURY TRIAL IN ANY SUCH PROCEEDINGS. Lessee authorizes Lessor to sign financing statements and file financing statements on Lessee's behalf. Lessee agrees the Lease is a Finance Lease as defined in Article 2A of the Uniform Commercial Code ("UCC"), that Lessee has selected both the Equipment and the vendor, and that Lessor is entitled to all benefits, privileges and protections of a lessor under a finance lease. To the extent permitted by law, Lessee agrees to waive any and all rights and remedies granted to Lessee under Article 2A of the UCC. If this Lease is deemed to be a secured transaction, Lessee grants Lessor a security interest in the Equipment to secure all of Lessee's obligations under this Lease. Lessee agrees that the Equipment will only be used for business purposes and not for personal, family or household use. Lessee and Guarantor (if any) agree that a facsimile or electronic copy of the Lease and Guaranty with facsimile or electronically transmitted signatures may be treated as an original and will be admissible as evidence of the Lease and Guaranty; provided, however, only the executed copy which is marked "Original" and is in the Lessor's possession shall constitute chattel paper under the UCC. The parties both intend to comply with all applicable laws. In no event will Lessor charge or collect any amounts in excess of those allowed by applicable law. Any part of this Lease that could be read under any circumstances to allow for a charge higher than that allowable under any applicable legal limit is limited and modified by this paragraph to limit the amounts chargeable under this Lease to the maximum amount allowed under the legal limit.

THIS LEASE IS EFFECTIVE ONLY UPON SIGNING BY BOTH PARTIES. THIS LEASE IS NON-CANCELLABLE BY LESSEE. LESSEE REPRESENTS THAT ALL ACTIONS REQUIRED TO AUTHORIZE THE EXECUTION OF THIS LEASE ON BEHALF OF THE LESSEE BY THE FOLLOWING SIGNATORY HAS BEEN TAKEN.

| Lessee: Chicago Surgical Clinic, Ltd. | Lessor: Wells Fargo Bank, N.A. |
|---|---|
| By: *Y Levith* | By: |
| Title: president    Date: 4/30/15 | Title:    Date: |

The undersigned absolutely, irrevocably and unconditionally guarantees to Lessor all payments and other obligations under this Lease or future leases to which Lessor and Lessee are parties. This is an absolute and continuing guaranty. THIS INDIVIDUAL GUARANTEE SHALL BE GOVERNED BY THE LAWS OF THE STATE OF ILLINOIS AND SUBJECT TO ALL TERMS OF PARAGRAPH 8 OF THE LEASE. The undersigned consents to any modification of the Lease and waives any right to require suit against Lessee before enforcing this Guaranty.

| Individual Guarantor: Yelena Levitin | Acceptance: The Equipment has been received and is in good working order. Accordingly, Lessee hereby authorizes Lessor to pay the supplier for the Equipment. |
|---|---|
| By: *Levitin* | By: |
| Address: 201 E. Strong St., suite #7 | Print Name and Title: |
| Date: 4/30/15   Wheeling, IL | Date: |

© 2014 Wells Fargo Bank, N.A. All rights reserved. Wells Fargo Equipment Finance is the trade name for certain equipment leasing and finance businesses of Wells Fargo Bank, N.A. and its subsidiaries.
MSGA-SSDOLLARBO.1114;BRINK:04302015.0852;874336;2167369

# Equipment Finance Agreement

Financing provided by:
**Wells Fargo Equipment Finance, Manufacturer Services Group**
300 Tri-State International, Suite 400 | Lincolnshire, IL 60069

A program for equipment supplied by:



---

**Debtor:** Chicago Surgical Clinic Ltd
201 E Strong St
Ste 7
Wheeling, IL 60090

**Agreement Number** 301-0184909-001

**Equipment Description:** 2-Harmony vLED Dual Light Packages, 2-Warming Cabinets Dual Compartments, 2-Single Compartments Warming Cabinets, 3-Vividimage D 27" HD Surgical Displays, Harmony EMS Ceiling systems, 2-Amsco 3085-General Surgical tables, 1-Flexmatic dual station Stainless steel scrub station

### Terms of Agreement

Term in Months: **60**   Monthly Payment: **See Step Payment Amendment**   Advance Payment: **N/A**

---

Wells Fargo Bank, N.A. (the "Secured Party") agrees to lend to Debtor an amount for the purchase of the equipment listed above (the "Collateral") upon the terms and conditions of this Equipment Finance Agreement (the "Agreement").

1. This Agreement shall commence on the date that it is accepted by Secured Party ("Commencement Date"). Debtor shall pay Secured Party at the office of Secured Party, or at such other place as Secured Party may hereafter designate, the Monthly Payment shown above, starting on the Commencement Date or any later date designated by Secured Party and on the first day of each consecutive month thereafter for the term hereunder. The Advance Payment(s) shown above is payable at the time of signing this Agreement.

2. Debtor acknowledges that Secured Party is not the manufacturer of the Collateral, nor the manufacturer's or supplier's agent, nor is the manufacturer or supplier an agent of the Secured Party. **SECURED PARTY MAKES NO EXPRESS OR IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO SUCH COLLATERAL AND HEREBY DISCLAIMS THE SAME. DEBTOR ACCEPTS THE COLLATERAL "AS IS".** In no event shall Secured Party have any liability for nor shall Debtor have any remedy against Secured Party for consequential, special, incidental, or punitive damages, or any loss of profits or savings, loss of use, or any other commercial loss. Debtor's obligation to pay the Monthly Payments is absolute and unconditional and is not subject to cancellation, reduction, setoff or counterclaim. Secured Party is not responsible for any repairs to or the performance of the Collateral or for any independent maintenance/service agreement which may cover the Collateral.

3. Debtor shall inspect the Collateral within five business days after delivery thereof to Debtor. Unless within said period Debtor gives written notice to Secured Party specifying any defects in or any other proper objections to the Collateral, it shall be conclusively presumed that Debtor has fully accepted the Collateral, that it is in full compliance with the terms of this Agreement and is in good condition and repair. If Debtor fails to accept the Collateral, Debtor agrees to indemnify and defend Secured Party from any claims under any purchase agreement including any demand for payments by the manufacturer or supplier of the Collateral. In addition, Debtor's Advance Payment(s) are forfeited to Secured Party as liquidated damages. Debtor agrees to pay a documentation fee of **$100.00**.

4. Debtor hereby grants to Secured Party a security interest under the Uniform Commercial Code ("UCC") to all of Debtor's right, title and interest in and to the Collateral and all replacements and proceeds thereof. Debtor grants such security interest to secure Debtor's performance of Debtor's obligations to Secured Party under this Agreement or future agreements to which Secured Party and Debtor are parties. Debtor agrees to pay either directly or as reimbursement to Secured Party any filing, registration and releasing fees required by the UCC or other law. Debtor shall ensure that such security interest is and shall remain a sole and valid first priority security interest (subject only to the lien of current taxes and assessments if such taxes are entitled to priority as a matter of law).

5. Debtor, shall, at Debtor's expense, comply with all laws and regulations relating to the Collateral or to this Agreement, and shall be responsible to pay all license fees and assessments and sales, use, property, excise and other taxes, penalties and interest now and hereafter imposed by any governmental body or agency upon the Collateral, or for the use thereof. In the event that any such fees, assessments, taxes, penalties and other interest attributable to the Collateral or to this Agreement are paid by Secured Party on behalf of Debtor or are found due after the expiration hereof, then upon demand, Debtor shall immediately remit same to Secured Party. Secured Party may charge Debtor an administrative fee for paying property tax on Debtor's behalf. The provisions of this paragraph shall survive the expiration of this Agreement.

6. Debtor agrees not to sell, assign, pledge or otherwise encumber or suffer a lien upon or against any interest in this Agreement or the Collateral, or to change the location of the Collateral without Secured Party's prior written consent. Debtor hereby agrees that Secured Party may assign or sell this Agreement, in whole or in part, without notice to Debtor, and such assignee shall assume and be entitled to all benefits herein granted to Secured Party. Debtor hereby agrees not to assert any defense, counterclaim or set off which it may have against Secured Party against said assignee. This Agreement correctly sets forth the entire Agreement between Secured Party and Debtor. No agreements or understandings shall be binding on either of the parties hereto unless specifically set forth in this Agreement. In the event of price changes, change orders, invoicing errors or similar matters, Debtor authorizes Secured Party to adjust the Monthly Payment accordingly by not more than ten (10%) percent. The term "Debtor" as used herein shall mean and include any and all Debtors who sign hereunder, each of whom shall be jointly and severally bound thereby. Debtor agrees that the Secured Party's depositing or endorsing of any check shall not be deemed an acceptance of the Agreement by Secured Party until Secured Party signs below.

7. Time is of the essence for this Agreement. No waiver by Secured Party of any breach or default shall constitute a waiver of any other breach or default by Debtor or waiver of any of Secured Party's rights. The following are Events of Default under this Agreement: (1) Debtor fails to pay any Monthly Payment or other charges herein provided ("Charges") within five (5) days after the same is due and payable; (2) Debtor fails to observe, keep or perform any other provision of this Agreement required to be observed, kept or performed by Debtor, (3) Debtor ceases doing business as a going concern; (4) Debtor or any guarantor become insolvent, are liquidated or dissolved, merge, transfer substantially all stock or assets, stop doing business, or assign rights or property for the benefit of creditors; (5) a petition is filed by or against Debtor or any guarantor under the Bankruptcy Code; (6) Debtor, without Secured Party's prior written consent, attempts to remove, sell, transfer, encumber, sublet or part with the possession of said Collateral, (7) Debtor breaches any other agreement between Debtor and Secured Party or any of Secured Party's affiliates, (8) Debtor suffers an adverse material change in its financial condition and Secured Party deems itself insecure. Upon the occurrence of an Event of Default, Secured Party or its agent shall have the right to exercise any one or more of the following remedies: (a) declare the balance of all unpaid Monthly Payments and Charges to be due and payable immediately, without notice or demand to Debtor; (b) to sue for and recover from Debtor an amount equal to the unpaid balance of the Monthly Payments and Charges due and to become due during the term of the Agreement; (c) require Debtor to assemble the Collateral and deliver it to Secured Party; and, (d) to enter upon Debtor's premises to take possession of the Collateral without demand or notice wherever same may be located. Upon retaking possession of the Collateral, Secured Party, at its option, may: (1) rent the repossessed Collateral, or any part thereof, to any third party on such terms and conditions

---

The undersigned hereby certifies that (s)he has read this Agreement, and warrants (s)he is duly authorized to execute this Agreement on behalf of Debtor. **THIS AGREEMENT INCLUDES THE TERMS ON THE ATTACHED PAGE(S).**

Debtor: Chicago Surgical Clinic Ltd

By: _J. Levitin_   Secured Party: Wells Fargo Bank, N.A.

Title: _PRESIDENT_   By: _____   Title: _____   Date: _____

© 2014 Wells Fargo Bank, N.A. All rights reserved. Wells Fargo Equipment Finance is the trade name for certain equipment leasing and finance businesses of Wells Fargo Bank, N.A. and its subsidiaries.

MSGA-EFA.1214:**BRINK**:03232015:1028:824896:2159949

Page 1 of 3

as Secured Party may determine, or (ii) sell the Collateral to the highest bidder at a public auction or at private sale, and credit the amount realized, less expenses incurred in connection with such disposition, to the unpaid balance of the Monthly Payments and Charges due and to become due. Debtor hereby waives any and all damages occasioned by such taking of possession. Any said taking of possession shall not constitute a termination of this Agreement, and shall not relieve Debtor of its original obligation herein unless Secured Party expressly so notifies Debtor in writing. Secured Party, at its sole discretion, shall have the right of set off with regard to any agreement between the parties.

Debtor shall be liable for and pay for all reasonable attorney's fees and costs incurred by Secured Party in connection with the collection or enforcement of this Agreement or in protecting Secured Party's rights therein, including, but not limited to, allocated costs for in-house counsel.

When a payment is not made within five days when due, Debtor agrees to pay Secured Party a service charge of 10% for each payment, or the maximum rate allowed by law, whichever is less. The minimum delinquent payment shall be $10.00. Failure of Secured Party to collect these charges during the Agreement term shall not be construed as a waiver of the right to recover these charges. This right to recover shall survive the expiration or termination of this Agreement.

8. For the purpose of this Agreement, any notices and demands required to be given shall be given to the parties in writing and by certified mail at the address herein set forth, or to such other address as the parties may hereinafter substitute by written notice.

9. Debtor, at its own cost and expense, agrees to (a) use the Collateral in conformity with all insurance requirements, manufacturer's instructions and manuals; (b) keep the Collateral repaired and maintained in good working order and as required by the manufacturer's warranty, certification and standard full service maintenance contract; (c) furnish all parts, mechanisms, devices and servicing required thereof and (d) give Secured Party or its agents reasonable access to inspect the Collateral and its maintenance and other records. In the event the property is destroyed or substantially damaged so as to render said Collateral unusable, Secured Party may, at its option, require Debtor to replace the property or pay Secured Party the unpaid balance of the Monthly Payments and Agreement Charges due and to become due during the term of the Agreement.

10. In the event Debtor is in default, Debtor will immediately return the Collateral in as good condition as received, less normal wear, tear and depreciation, to such place as is then specified by Secured Party, carefully crated, shipped freight prepaid and properly insured. If Debtor is required to return the Collateral to Secured Party, Debtor agrees within seven days after receipt of written notice from Secured Party, to pay Secured Party all costs incurred by Secured Party to either repair or recondition the Collateral. Secured Party shall, at its sole discretion, determine the cost to repair or recondition the Collateral.

Debtor shall indemnify Secured Party against and hold Secured Party harmless from any and all claims, actions, damages, including reasonable attorneys' fees, obligations, liabilities and liens, (including any of the foregoing arising or imposed without Secured Party's fault or negligence, or under the Doctrine of Strict Liability), arising out of the manufacture, purchase, possession, operation, condition, return or use of Collateral, or by operation of law. Debtor agrees that upon written notice by Secured Party of the assertion of such a claim, damage, action, obligation, liability or lien, Debtor shall assume full responsibility for the defense thereof. The provisions of this section shall survive the termination of the Agreement.

11. Debtor shall bear all risk of loss to the property and Debtor shall: (a) keep the Collateral insured against all risks of physical loss or damage for its full replacement value, naming Secured Party as loss payee; and (b) maintain public liability insurance, covering personal injury and equipment damage, naming Secured Party as additional insured with coverages and amounts acceptable to Secured Party. Said policy must provide Secured Party with not less than 30 days' prior written notice of cancellation, non-renewal or amendment and must provide deductible amounts acceptable to Secured Party. If Debtor fails to provide proof of property insurance, or if such insurance terminates for any reason, then Secured Party may elect to obtain such insurance on the Collateral at Debtor's expense. Debtor agrees that Secured Party may charge Debtor a periodic charge for such insurance. This periodic charge will include reimbursement for premiums advanced by Secured Party to purchase insurance, billing and tracking fees, charges for processing and related fees associated with other insurance, and a finance charge on any advances Secured Party makes for premiums, (collectively, the "Insurance Charge"). Secured Party and/or one or more of its affiliates and/or agents may receive a portion of the Insurance Charge, which may include a profit. Secured Party is not obligated to obtain and may cancel, the other insurance at any time without notice to Debtor. Any other insurance need not name Debtor as an insured or protect Debtor's interests. the Insurance Charge may be higher than if Debtor obtained insurance on its own.

12. Secured Party may require from time to time, and Debtor agrees to furnish, statements setting forth the financial condition and operations of Debtor and guarantor(s). Debtor warrants that all credit and financial information submitted to Secured Party herewith, or at any other time during the term of this Agreement, is true and correct. In the event Debtor has possession of the property, by prior agreement or otherwise, prior to the commencement date of this Agreement, Debtor hereby waives any claim which may arise out of any alleged defect in the property.

13. Debtor acknowledges that Debtor has selected both the Collateral and the supplier and Secured Party has not selected, manufactured or supplied the Collateral. **TO THE EXTENT PERMITTED BY LAW, DEBTOR WAIVES ANY AND ALL RIGHTS AND REMEDIES CONFERRED UPON A DEBTOR BY ARTICLE 9 OF THE UCC.** Debtor authorizes Secured Party to file financing statements on Debtor's behalf.

14. This Agreement shall be deemed to have been made in Lake County, Illinois, regardless of the order in which the signatures of the parties shall be affixed hereto. In the event that any litigation or other legal proceedings shall arise under and/or in connection with this Agreement and/or the Collateral, such litigation or other legal proceeding shall be conducted in any federal or state court located within or for Lake County, Illinois. **FURTHERMORE, DEBTOR CONSENTS TO PERSONAL JURISDICTION AND VENUE IN ANY FEDERAL OR STATE COURT LOCATED WITHIN OR FOR LAKE COUNTY, ILLINOIS** and Debtor hereby waives any defenses or objections thereto including defenses based on the Doctrine of Forum Non Conveniens. This Agreement shall be interpreted, and the rights and liabilities of the parties hereto determined, in accordance with the laws of the State of Illinois. **DEBTOR EXPRESSLY WAIVES THE RIGHT TO TRIAL BY JURY.**

15. If any provision hereof or any remedy provided for is invalid under any applicable law, such provision shall be inapplicable and deemed omitted, but the remaining provisions hereof, including the remaining default remedies, shall be given effect in accordance with the manifest intent hereof.

16. This instrument constitutes the entire agreement between the parties. Debtor understands and agrees that neither the equipment supplier nor its sales personnel are agents of Secured Party. No supplier or agent thereof is authorized to bind Secured Party or to waive or modify any term herein. No waiver by Secured Party of any provision hereof shall constitute a waiver of any other term. In the event Debtor issues a purchase order to Secured Party covering Collateral to be financed herein, it is agreed that such a purchase order is issued for purposes of authorization and Debtor's internal use only, and none of its terms and conditions shall modify the terms and conditions of this Agreement and/or related documentation, or affect Debtor's responsibility to Secured Party as defined in this Agreement. Debtor agrees that a facsimile or electronic copy of the Agreement with facsimile or electronically transmitted signatures may be treated as an original and will be admissible as evidence of the Agreement; provided, however, only the executed copy which is marked "Original" and is in Secured Party's possession shall constitute chattel paper under the UCC.

## GUARANTY

The undersigned guarantor ("Guarantor") guarantees that the Debtor will make all payments and pay all the other charges required under the Agreement and future Agreements to which Secured Party and Debtor are parties when they are due and will perform all other obligations under the Agreement fully and promptly. Guarantor also agrees that Secured Party may make other arrangements with the Debtor and Guarantor will still be responsible for those payments and other obligations. Guarantor consents to any modification, amendment or extension of the Agreement without releasing Guarantor's obligation under this Guaranty. If Debtor defaults, Guarantor will immediately pay in accordance with the default provisions of the Agreement all sums due under the terms of the Agreement and will perform all other obligations of Debtor under the Agreement. Guarantor hereby waives the right to require Secured Party to (a) proceed against Debtor or any other guarantor or pledgor, (b) proceed against or exhaust the Collateral, or (c) pursue any other right or remedy for the benefit of Guarantor. Guarantor will reimburse Secured Party for all the expenses it incurs in enforcing any of Secured Party's rights against the Debtor or Guarantor, including attorneys' fees and allocated costs for in-house counsel. This is an absolute and continuing guaranty. **THE AGREEMENT AND THIS GUARANTY HAVE BEEN MADE IN LAKE COUNTY, ILLINOIS. IF ANY LEGAL PROCEEDING TAKES PLACE CONCERNING THE AGREEMENT AND/OR THIS GUARANTY, IT WILL TAKE PLACE IN ANY COURT IN OR FOR LAKE COUNTY, ILLINOIS AND ILLINOIS LAW WILL APPLY. GUARANTOR AGREES FURTHER TO NOT RAISE ANY OBJECTION CONCERNING ANY INCONVENIENCE THIS MAY CAUSE GUARANTOR.**

Guarantor Name: Yelena Levitin
By: _Y. Levitin_
Address: _201 E. Strong Ave  Wheeling, IL 60090  Suite 7_
Date: _3/23/2015_

<mark />

## Acceptance Certificate

Financing provided by:
*Wells Fargo Equipment Finance, Manufacturer Services Group*
300 Tri-State International, Suite 400 | Lincolnshire, IL 60069

A program for equipment supplied by:



Amerinet Choice

Agreement Number 301-0184909-001

**Debtor:** Chicago Surgical Clinic Ltd
201 E Strong St
Ste 7
Wheeling, IL 60090

**Equipment Description:**
2-Harmony vLED Dual Light Packages, 2-Warming Cabinets Dual Compartments, 2-Single Compartments Warming Cabinets, 3-Vividimage D 27" HD Surgical Displays, Harmony EMS Ceiling systems, 2-Amsco 3085-General Surgical tables, 1-Flexmatic dual station Stainless steel scrub station

As evidenced by this Acceptance Notice, we acknowledge receipt, in good condition and satisfactory operation, all of the items described above and certify that Secured Party has fully and satisfactorily performed each, every, and all covenants and conditions to be performed by it under the Equipment Finance Agreement between Secured Party and Debtor. We authorize you to pay the supplier for the Collateral, supplies and/or independent maintenance agreement(s).

We accept the above mentioned Collateral, and waive insofar as Secured Party and its assignees are concerned any reservations as to condition, correctness, capability or capacity of the Collateral, and understand that any shortcomings in the Collateral or its operation, without reservation, will not be grounds for withholding of any payments due or to become due under the Agreement.

We agree that the agreement between secured party and debtor is the only agreement, sale or finance arrangement we have entered into for this collateral, and we acknowledge that secured party is not an agent of the vendor (equipment supplier) nor is the vendor an agent of secured party.

Debtor: Chicago Surgical Clinic Ltd
By: *Y Levitin* (signature)
Print Name and Title: YELENA LEVITIN, president
Date: 3/23/2015
<mark />

MSGA-EFA.1214:301-0184909-001    Page 3 of 3

# Billing and Equipment Location

*Wells Fargo Equipment Finance, Manufacturer Services Group*
300 Tri-State International, Suite 400 | Lincolnshire, IL 60069



Contract Number 301-0184909-001

Customer Name: Chicago Surgical Clinic Ltd
Federal Tax ID Number: 36-4479531

Purchase Order Number (if required on invoice): _____

Billing Address: Chicago Surgical Clinic Ltd , 201 E Strong St , Ste 7 , Wheeling , IL 60090
Accounts Payable Contact (Required): SAM D. REYNISH
E-mail Address: SAM_REYNISH@YAHOO.COM
Phone Number (Required): (847)215-0530    Fax Number: (847)215-0951

☒ The Billing Address stated above is correct.
OR
☐ Change the Billing Address to:

Street _____    City _____

State: _____   Zip Code: _____

Equipment Location: 201 E Strong St, Ste 7, Wheeling, IL 60090
Equipment Location Contact (Required): SAM D. REYNISH
E-mail Address: SAM_REYNISH@YAHOO.COM
Phone Number (Required): (847)215-0530    Fax Number: (847)215-0951

☐ The Equipment Location stated above is correct.
OR
☒ Change the Equipment Location to:
Street 129 W Rand Rd.    City Arlington Heights
State IL    Zip Code 60004    County Cook

Notice: To help the government fight the funding of terrorism and the money laundering activities, U.S. Federal law requires financial institutions to obtain, verify and record information that identifies each person (individuals or businesses) who opens an account. What this means for you: When you open an account or add any additional service, we will ask you for your name, address and taxpayer identification number that will allow us to identify you. We may also ask to see other identifying documents.

© 2014 Wells Fargo Bank, N.A. All rights reserved. Wells Fargo Equipment Finance is the trade name for certain equipment leasing and finance businesses of Wells Fargo Bank, N.A. and its subsidiaries.
MSGA-BILLTOSHIPTO.0614:BRINK:03232015.1026:824896:2159949

## Step Payment Amendment

*Wells Fargo Equipment Finance, Manufacturer Services Group*
300 Tri-State International, Suite 400 | Lincolnshire, IL 60069



This Amendment amends and supplements Agreement No. **301-0184909-001** (the "Agreement"), by and between **Chicago Surgical Clinic Ltd** and **Wells Fargo Bank, N.A.**.

The payment section of the Agreement is replaced with the following:

| Number of Monthly Payments | Monthly Payment Amount* |
|---|---|
| 6 | $600.00 |
| 60 | $3,285.00 |

*If applicable, tax will be added to the payment at the appropriate rate

Except as specifically amended herein, all other provisions of the Agreement shall remain in full force and effect.

**IN WITNESS WHEREOF,** the parties have caused this Amendment to be executed by their duly authorized representatives as of the date of the Agreement.

| Chicago Surgical Clinic Ltd | Wells Fargo Bank, N.A. |
|---|---|
| By: *Y Levitin* | By: |
| Name: YELENA LEVITIN | Name: |
| Title: president | Title: |

© 2014 Wells Fargo Bank, N.A. All rights reserved. Wells Fargo Equipment Finance is the trade name for certain equipment leasing and finance businesses of Wells Fargo Bank, N.A. and its subsidiaries.
MSGA-STEPPAYAMEND.0414:BRINK:03232015.0955:824896:2159949



**GE Capital**

Internal Contract Reference Number: _____

Internal Order Reference Number: _____

# Lease Agreement (Quasi)
## Dated As Of: April 24, 2017

| Customer's Legal Name and Billing Address ("Lessee") | Equipment Site (if different) |
|---|---|
| Name: CHICAGO SURGICAL CLINIC, LTD. | Name: |
| Street Address: 129 W. RAND ROAD | Street Address: |
| City, State, Zip: ARLINGTON HEIGHTS, IL 60004 | City, State, Zip: |

Subject to the terms and conditions of this Lease Agreement (Quasi) (this "Agreement"), and subject to credit approval, GE HFS, LLC (together with its successors and assigns, "Lessor"), agrees to lease to Lessee the Equipment described below. Lessee hereby authorizes Lessor and/or any proposed assignee of Lessor, investor or participant in this transaction to perform all background, credit, judgment, lien and other checks and searches (including to review credit reports from a national credit bureau) as any such party deems appropriate in its sole judgment in connection with credit approval of the transactions evidenced hereby, and subsequently for the purposes of updating, renewing or extending the credit evidenced hereby and for reviewing or collecting amounts due hereunder.

| EQUIPMENT DESCRIPTION Supplier/Manufacturer ("Supplier") | Lessor's Capitalized Cost | Number of Units | Model, Unit # and/or Type of Equipment ("Equipment") |
|---|---|---|---|
| GE HEALTHCARE, A DIVISION OF GENERAL ELECTRIC CORP. | $62,000.00 | 1 (ONE) | OEC 9800 PLUS DIGITAL MOBILE STANDARD C-ARM PMCARE |

**1. TERM; MONTHLY PAYMENT**: The term hereof ("Term") begins on the earlier of the date (i) on which the Equipment has been delivered to the Equipment Site and has been assembled and/or installed (to the extent assembly and/or installation is required) and (ii) Lessee first uses the Equipment (the "Start Date"), provided that if Lessor requires a certificate of acceptance ("C of A") with respect to the Equipment, then the Term will begin upon Lessor's receipt of such C of A signed by Lessee. Beginning on the Start Date, Lessee shall remit the Monthly Payments set forth below ("Monthly Payments") and other sums to Lessor to the address specified by Lessor. The Monthly Payments are calculated using the per annum interest rate set forth below (the "Interest Rate"). Interest shall be calculated on the basis of a 360-day year for the actual number of days occurring in the period for which interest is payable. In states assessing upfront sales and use tax, the Monthly Payments will be adjusted to include the applicable sales and use tax amortized over the Term using a rate that preserves Lessor's economic yield for the transaction described herein. Monthly Payments may be adjusted prior to the Start Date for changes in market conditions as determined by Lessor in its sole discretion. If the Start Date does not occur on or before the date which is the earlier of (i) 120 days following the date hereof or (ii) December 31 of the calendar year in which the date hereof occurs, then the Interest Rate and Monthly Payments may be adjusted by Lessor on or before the Start Date. In addition, Lessor may adjust the Monthly Payments, up or down, by no more than 10% to account for Equipment change orders, Equipment returns, invoicing errors, and similar matters. Lessor will notify Lessee of any adjustment pursuant to this paragraph, and Lessee will be required to provide written confirmation of its acceptance of such new Interest Rate and Monthly Payments prior to Lessor advancing any funds hereunder. A $200.00 documentation fee will be due from Lessee and will be billed on the first Monthly Payment invoice. Lessee shall initial below to indicate the applicable Term, Monthly Payment and Interest Rate.

| Lessee Initial | Term (Months) | Interest Rate | Monthly Payment |
|---|---|---|---|
| | | | |
| | 60 | 6.25% | 6 @ $99.00<br>54 @ 1,348.56 |

**2. NET LEASE; PAYMENT OBLIGATIONS**: This Agreement is a net lease and is non-cancelable. Lessee's obligation to pay Monthly Payments and other amounts due by Lessee under this Agreement (collectively, the "Obligations") is unconditional. Lessee must pay all Obligations to Lessor, even if any defect in, damage to, or loss of use of, any Equipment occurs for any reason (each, an "Equipment Loss"). Any claims for an Equipment Loss or for breach by Supplier of any service or warranty obligations can be pursued only against the Supplier. Lessee cannot withhold or set off any amounts owing to Lessor because of claims that Lessee may have against Supplier or any other manufacturer or service provider. If any amount due hereunder is not received within three days after its due date, Lessee shall pay, in addition to the amount due, a late payment charge of the greater of 5% of such unpaid amount or $35.00, but not exceeding any lawful maximum. Credit to Lessee's account may be delayed if (i) payment is not received at Lessor's payment address indicated in Lessor's invoice or other instructions from Lessor, or (ii) payment is received in any form other than direct debit, wires, company checks or certified checks. Delayed credit may cause Lessee to incur a late payment charge. All credit for payments is subject to final payment by the institution on which the item was drawn. All payments made to Lessor hereunder may be applied by Lessor in any order or manner, in its sole discretion, to late charges, rent payments, interest, principal and other amounts due hereunder, or under any other agreement. Lessor may at its option offset and deduct any liability or obligation of Lessee from any or all sums owed by Lessor to Lessee. Written communication concerning disputed payment amounts, including any check or other payment instrument that is tendered as full satisfaction of a disputed amount, or is tendered with other conditions or limitations, must be mailed or delivered to Lessor at its address stated herein or at such other address that Lessor may specify.

**3. TAXES**: If permitted by law, and unless otherwise instructed by Lessor, Lessee will timely report and pay all taxes, fees and assessments due, assessed or levied against any Equipment or this Agreement (collectively "Taxes"), except for Taxes on the net income of Lessor. If Lessor is charged, assessed or pays any Taxes, Lessee will promptly reimburse Lessor (on an after tax basis) therefor. Lessee shall show Lessor as the owner of the Equipment on all property tax reports or returns, and, upon Lessor's request, send Lessor a copy of each tax report or return and evidence of Lessee's payment of Taxes. If Lessor is required by law or elects to report and pay property taxes related to the Equipment, as compensation for Lessor's internal and external costs in the administration of such taxes, Lessee shall pay to Lessor a property tax administration fee equal to $12 per unit of Equipment per year during the Term, not to exceed the lawful maximum. If Lessee claims exemption from any Taxes, Lessee shall deliver to Lessor a tax exemption certificate and such other documents as Lessor may request.

**4. USE, OPERATION AND MAINTENANCE**: (a.) Lessee will (i) comply with all laws, rules and regulations applicable to the Equipment (including its use) and Lessee, including, without limitation, the USA PATRIOT ACT and all laws, rules and regulations relating to import or export controls, anti-money laundering and terrorist financing, (ii) use the Equipment for commercial purposes and not for personal, family or household purposes, (iii) keep the Equipment free and clear of all liens, (iv) not move any Equipment from the Equipment Site and (v) maintain the Equipment in good operating order in accordance with the manufacturer's recommendations. (b.) All additions, parts, supplies, accessories, and equipment ("Additions") furnished or attached to any Equipment that are not readily removable shall become the property of Lessor. Lessee will not attach or install any Equipment to or in any other personal or real property. (c) Lessee shall promptly provide to the Supplier and the manufacturer of the Equipment (if different than the Supplier) any and all information received or generated by Lessee (regardless of how and in what form received or generated) that alleges any deficiencies related to the identity, labeling, quality, durability, reliability, safety, effectiveness and/or performance of the Equipment.

**5. LOSS OR DAMAGE; CASUALTY VALUE; INSURANCE**: Lessor bears no responsibility for transporting, or the risk of any loss, disappearance or damage of or to, the Equipment or any part thereof, all such responsibility and risks being assumed by Lessee. Within ten days of learning that any Equipment is lost, irreparably damaged or permanently unfit for use ("Casualty"), Lessee will provide Lessor full details of the Casualty and will pay to Lessor an amount equal to (i) the sum of all future Monthly Payments, each discounted to its net present value at a simple interest rate of 4% per annum (or if less, the maximum lawful rate) ("Casualty Value"); plus (ii) any other amounts due hereunder. Lessee shall continue to pay Monthly Payments until Lessor receives the Casualty Value and all other amounts then due hereunder, at which time this Agreement will terminate. Lessee shall at its own expense maintain casualty insurance on the Equipment with carriers acceptable to Lessor for an amount equal to the higher of the Casualty Value and the full replacement cost of the Equipment, and against such hazards as Lessor may require, with losses under the policies payable to Lessor as lender loss payee; and liability insurance (minimum of $2,000,000) for personal injuries, death and/or property damages on terms satisfactory to Lessor, naming Lessor as an additional insured.

**6. DEFAULT AND REMEDIES**: (a) Lessor may declare Lessee in default hereunder if: (i) Lessee fails to pay any Obligations within ten days of the due date; (ii) Lessee breaches any of its other obligations hereunder and fails to cure that breach within 30 days after written notice from Lessor; (iii) Lessee or any guarantor of any of the Obligations ("Guarantor") dissolves, becomes insolvent or ceases to do business as a going concern; (iv) any individual Guarantor dies or is declared incompetent; or (v) Lessee or any Guarantor defaults under any other agreement with Lessor or an affiliate of Lessor. (b) Upon the occurrence of any default, Lessor may do one or more of the following: (i) declare all Obligations

(including all future Monthly Payments) immediately due and payable; (ii) take possession of, and/or require Lessee to return, the Equipment; or (iii) pursue any other remedy available at law or in equity. Waiver of any default shall not be a waiver of any other or subsequent default. Lessee shall pay Lessor for any and all actual attorneys' fees and other expenses incurred by Lessor in connection with the enforcement of Lessor's rights and remedies hereunder.

**7. INDEMNIFICATION:** LESSEE SHALL INDEMNIFY AND HOLD LESSOR, ITS AGENTS, EMPLOYEES, SUCCESSORS AND ASSIGNS HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS AND LOSSES, INCLUDING LEGAL EXPENSES, OF WHATSOEVER KIND ARISING OUT OF OR RELATING TO THE EQUIPMENT OR THIS AGREEMENT ("CLAIMS"), INCLUDING, WITHOUT LIMITATION, CLAIMS ARISING OUT OF THE SELECTION, MANUFACTURE OR PURCHASE OF THE EQUIPMENT, OWNERSHIP OF THE EQUIPMENT DURING THE TERM, AND THE DELIVERY, POSSESSION, MAINTENANCE, AND OPERATION OF THE EQUIPMENT. LESSEE SHALL, UPON LESSOR'S REQUEST, DEFEND ANY ACTIONS BASED ON, OR ARISING OUT OF, ANY OF THE FOREGOING.

**8. PURCHASE OPTION:** If Lessee is not in default, Lessee may purchase all of the Equipment at lease expiration on an "AS IS, WHERE IS" basis for $1.00. Lessee's rights to continue to use any software on the Equipment are subject to the terms of any license agreement between Lessee and the licensor of such software.

**9. REMOVAL AND RETURN OF EQUIPMENT:** If this Agreement terminates prior to its scheduled expiration date or if Lessor requires Lessee to return the Equipment upon the occurrence of any default, Lessee shall, at its expense, return all of the Equipment to a place designated by Lessor; provided, however, that Lessor, in its sole discretion, may require that the OEM or other service provider approved by Lessor de-install, crate and/or transport the Equipment, the costs of which shall be borne by Lessee. Lessee shall, at its expense, ensure that the Equipment, upon receipt by Lessor, is in the same condition and appearance as when received by Lessee (reasonable wear and tear excepted) and in good working order and condition. All waste material and fluid must be removed from the Equipment, and disposed of, by Lessee in accordance with all applicable laws and Lessee shall otherwise clean the Equipment in accordance with all manufacturer recommended and state-of-the-art protocols, industry standards and all applicable laws and regulations. Upon the request of Lessor (or its agent), Lessee shall deliver to Lessor (or its agent) prior to the removal and return of the Equipment a certificate pursuant to which Lessee shall (i) certify that the Equipment has been cleaned to remove any hazardous substances and that the area around the Equipment has been made safe and accessible, and (ii) specify whether the Equipment has been in contact with any radioactivity, infectious or hazardous biological substances and/or any other hazardous chemicals (and if so, provide the details of such contact), and whether the Equipment contains any liquid and/or gas (and if so, describing the same). Until the Equipment is delivered to the location designated by Lessor (i) Monthly Payments shall continue to accrue and be payable and (ii) Lessee shall continue to bear all risk of loss.

**10. ASSIGNMENT:** LESSEE SHALL NOT SELL, ASSIGN OR SUBLEASE ANY EQUIPMENT OR THE INTEREST OF LESSEE THEREIN OR THE RIGHTS OR OBLIGATIONS OF LESSEE HEREUNDER WITHOUT LESSOR'S PRIOR WRITTEN CONSENT, AND ANY SUCH PURPORTED SALE, ASSIGNMENT OR SUBLEASE SHALL BE NULL AND VOID. Lessor may, without the consent of Lessee, assign this Agreement and its interest in the Equipment. Upon receipt of written notice of an assignment from Lessor, Lessee will pay all Monthly Payments and all other amounts payable hereunder to such assignee or as instructed by Lessor. Lessee waives and agrees not to assert against any such assignee any defense, set-off, recoupment claim or counterclaim that Lessee has or may at any time have against Lessor.

**11. PROTECTED HEALTH INFORMATION:** Lessee shall not disclose any Protected Health Information (as defined in 45 C.F.R. § 160.103) ("PHI") to Lessor. Prior to Lessor obtaining possession of the Equipment, whether after default, termination hereof or otherwise, Lessee shall remove any and all PHI from the Equipment, including from any software, and ensure that the transfer of the Equipment will not result in Disclosure (as defined in 45 C.F.R. § 160.103) of any PHI.

**12. OWNERSHIP FOR TAX PURPOSES; GRANT OF SECURITY INTEREST; USURY SAVINGS:** (a) For income tax purposes, the parties intend that Lessee be considered the owner of the Equipment. Lessor agrees (i) to treat Lessee as the owner of the Equipment on its federal income tax return, (ii) not to take actions or positions inconsistent with such treatment on or with respect to its federal income tax return, and (iii) not to claim any tax benefits available to an owner of the Equipment on its federal income tax return; provided, however, that Lessor shall not be deemed to have violated the foregoing by taking a tax position inconsistent with the foregoing to the extent such position is required by law, or is taken through inadvertence so long as such inadvertent tax position is reversed by Lessor upon its discovery. (b) Lessee hereby grants to Lessor, as security for all Obligations, a security interest in the Equipment, all Additions thereto, the general intangibles related thereto and all proceeds of the foregoing (collectively, the "Collateral"). Lessee hereby authorizes Lessor to file a financing statement and amendments thereto describing the Collateral and containing any other information required by the applicable Uniform Commercial Code ("UCC"). (c) It is the intention of the parties to comply with any applicable usury laws. Notwithstanding any provision to the contrary herein, in no event shall this Agreement require the payment or permit the collection of interest in excess of the maximum permitted by applicable law. If any interest contracted for, charged or received hereunder exceeds the maximum amount of interest permitted by applicable law, then (i) neither Lessee nor any other person or entity now or hereafter liable for the payment thereof shall be obligated to pay the amount of such excess interest, (ii) any such excess interest which may have been collected shall be either applied as a credit against the then unpaid principal balance or refunded to Lessee, at Lessor's option and (iii) the effective rate of interest shall be automatically reduced to the maximum lawful contract rate allowed under applicable law.

**13. MISCELLANEOUS:** LESSEE AND LESSOR WAIVE ALL RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT. The terms "hereof", "hereunder" and "herein" are references to this Agreement. Lessor's failure at any time to require strict performance by Lessee of any of the provisions hereof shall not waive or diminish Lessor's right at any other time to demand strict compliance with this Agreement. If more than one Lessee is named herein, the liability of each shall be joint and several. All required notices shall be deemed adequately given if sent by registered or certified mail, or by a nationally recognized overnight courier service, if to Lessor, at 20225 Watertower Blvd., Brookfield, WI 53045, and if to Lessee, at its address stated herein, or in each case at such other place as such addressee may have specified in writing by notice as prescribed herein. This Agreement and any addenda and/or schedules hereto constitute the entire agreement of the parties with respect to the subject matter hereof. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL IN ALL RESPECTS BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF WISCONSIN (WITHOUT REGARD TO ITS CONFLICT OF LAWS PRINCIPLES). If any provision hereof is in conflict with any applicable law or rule, then such provision will be deemed null and void to the extent that it may conflict therewith, but without invalidating any other provision(s) hereof. This Agreement will be binding upon Lessee, its successors and assigns, and will inure to the benefit of Lessor, its successors and assigns. No modification of this Agreement or any waiver of any of its terms shall be valid unless in writing and signed by the parties hereto provided, however, that Lessor may make adjustments to the Interest Rate and Monthly Payments, in each case to the extent permitted herein. Lessee has not received any tax or accounting advice from Lessor. The provisions hereof regarding "Taxes", "Default and Remedies", "Indemnification" and "Disclaimer" will continue in full force and effect after the expiration or termination hereof. Lessee will furnish its annual financial statements and such interim statements as Lessor may request, in form satisfactory to Lessor, prepared on the basis of generally accepted accounting principles, complete and correct, and fairly presenting Lessee's financial condition as of the date thereof. Lessor may at any reasonable time inspect the Equipment. This Agreement may be executed in counterparts as described below, each of which shall be deemed an original (except as otherwise provided below), but all of which together shall constitute one and the same instrument. Lessee shall sign this Agreement using ink on paper (a "manual" signature) or, if instructed or expressly permitted by Lessor in writing, by electronic or digital means (an "electronic" signature), and deliver the signed copy to Lessor. This Agreement is not binding on Lessor until Lessor signs it. When a copy hereof containing Lessee's signature is signed by Lessor (manually, electronically or digitally, at Lessor's option), then such copy shall be for all purposes (including perfection of security interests and admissibility of evidence) the sole original authenticated Agreement; and to the extent, if any, that this Agreement constitutes chattel paper (as defined in the applicable UCC), no security interest herein may be created through the transfer or possession of any counterpart or copy hereof, other than the copy executed by Lessor. If Lessee signs or transmits this Agreement to Lessor electronically or digitally, Lessee shall provide the counterpart hereof containing Lessee's original manual signature to Lessor at Lessor's request. Lessee agrees not to raise as a defense to the enforcement hereof that Lessee or Lessor executed this Agreement by electronic signature or used facsimile or other electronic means to transmit its signature on this Agreement. Lessor may receive compensation and/or discounts ("Discounts") from the Supplier or manufacturer of the Equipment in order to enable Lessor to reduce the cost of Lessee's lease below what Lessor otherwise would charge. If Lessor received any Discounts, such Discounts are reflected in the Monthly Payments. Any such Discounts provided are intended to comply with the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b). To the extent required by 42 C.F.R. § 1001.952(h) (the Anti-Kickback Statute discount safe harbor regulations) or other applicable laws and regulations, Lessee must fully and accurately reflect in cost reports or other submissions to federal healthcare programs all Discounts provided hereunder and, upon request by the Secretary of the U.S. Department of Health and Human Services or a state agency, must make available information provided to Lessee concerning the Discounts. Lessee agrees that Lessor may pay fees or other compensation to Supplier and/or manufacturer of the Equipment, a broker or other third party in connection herewith, which, if so paid, may have resulted in the Monthly Payments being higher than they would have been had such amounts not been paid. Lessee and each of its affiliates authorize Lessor to disclose information (other than PHI) about Lessee and its affiliates that Lessor may at any time possess to (i) any party with a financial interest herein or the Equipment, and (ii) any state or federal regulator with supervisory authority over Lessor.

**14. UCC ARTICLE 2A NOTICE; DISCLAIMER:** THIS AGREEMENT IS A "FINANCE LEASE" AS DEFINED UNDER UCC SECTION 2A-103. LESSOR HEREBY MAKES THE FOLLOWING DISCLOSURES TO LESSEE PRIOR TO EXECUTION HEREOF: (A) THE SUPPLIER OF THE EQUIPMENT IS IDENTIFIED ABOVE, (B) LESSEE IS ENTITLED TO THE PROMISES AND WARRANTIES PROVIDED TO LESSOR BY SUPPLIER WITH RESPECT TO THE EQUIPMENT, AND (C) LESSEE MAY COMMUNICATE WITH SUPPLIER AND RECEIVE AN ACCURATE AND COMPLETE STATEMENT OF SUCH PROMISES AND WARRANTIES, INCLUDING ANY DISCLAIMERS AND LIMITATIONS OF PROMISES OR WARRANTIES. TO THE EXTENT PERMITTED BY APPLICABLE LAW, LESSEE WAIVES ANY AND ALL RIGHTS AND REMEDIES CONFERRED UPON A LESSEE IN ARTICLE 2A OF THE APPLICABLE UCC. LESSEE ACKNOWLEDGES THAT IT HAS SELECTED THE EQUIPMENT WITHOUT ANY ASSISTANCE FROM LESSOR, ITS AGENTS OR EMPLOYEES. LESSOR MAKES NO WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, WITH RESPECT TO THE EQUIPMENT OR ANY COMPONENT THEREOF, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY AS TO DESIGN, COMPLIANCE WITH SPECIFICATIONS, QUALITY OF MATERIALS OR WORKMANSHIP, MERCHANTABILITY, FITNESS FOR ANY PURPOSE, USE OR OPERATION, SAFETY, PATENT, TRADEMARK OR COPYRIGHT INFRINGEMENT, OR TITLE. LESSOR SHALL HAVE NO LIABILITY TO LESSEE FOR ANY, PUNITIVE, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES SUCH AS LOST PROFITS OR REVENUES. LESSEE AUTHORIZES LESSOR (WITHOUT ANY FURTHER NOTICE) TO INSERT ANY MISSING INFORMATION AND TO CORRECT OBVIOUS ERRORS (INCLUDING ANY ERRORS WITH RESPECT TO LESSEE'S CORRECT LEGAL NAME) BUT NO OTHER VARIATION OR MODIFICATION OF THIS AGREEMENT OR ANY WAIVER OF ANY OF ITS PROVISIONS SHALL BE VALID UNLESS IN WRITING AND SIGNED BY EACH PARTY HERETO.

15. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person who enters into a transaction with such financial institution. What this means for Lessee: Lessor may ask for Lessee's name, address and other information that will allow Lessor to identify Lessee. Lessor may also ask to see identifying documents.

IF MORE THAN ONE INDIVIDUAL (NON-ENTITY) LESSEE: It is our intent to apply for joint credit _____ _____ (each individual (non-entity) Lessee to Initial in space provided)

| LESSOR: GE HFS, LLC | LESSEE: CHICAGO SURGICAL CLINIC, LTD. |
|---|---|
| Authorized Signature: _____ | Authorized Signature: _____ |
| Printed Name: _____ | Printed Name: _____ |
| Title: Duly Authorized Signatory | Title: _____ |
| | Lessee Federal Tax ID#: _____ |
| | No. of Yrs. In Business: _____ |
| | No. of Owners: _____ |
| | Principal's Name: _____ |
| | Principal's SS#: _____ |
| | Date of Birth (for individual Lessee): _____ |

   OLYMPUS FINANCIAL SERVICES

## MASTER LEASE AGREEMENT

Master Agreement Number:   0016712

**LESSOR:**
OLYMPUS AMERICA INC.
3500 CORPORATE PARKWAY
CENTER VALLEY, PA 18034

**LESSEE:**
CHICAGO SURGICAL CLINIC, LTD.
129 W RAND ROAD
ARLINGTON HEIGHTS, IL 60004

This Master Lease Agreement (which, together with all schedules, exhibits, riders, attachments, supplements and amendments hereto are collectively referred to as "Master Agreement"), dated as of September 21, 2016 is entered into by and between Olympus America Inc., a New York corporation (together with its and assigns, if any, "Lessor"), and CHICAGO SURGICAL CLINIC, LTD., a(n) Illinois limited partnership ("Lessee")

KEY DEFINITIONS. For purposes of this Master Agreement, the following terms shall have the following meanings ascribed thereto:

(a) **"Acceptance Date"** as to any Lease means, the date Lessee shall have actually accepted the Equipment subject to such Lease or shall be deemed to have accepted the Equipment subject to such Lease in accordance with Section 3.

(b) **"Equipment"** has the meaning specified in Section 1.

(c) **"Equipment Location"** means, as to any Equipment, the address at which such Equipment is delivered and installed, as specified in the applicable Schedule. Lessee shall not move the Equipment from the Equipment Location without the prior written consent of Lessor.

(d) **"Lease"** has the meaning specified in Section 1.

(e) **"Guarantor"** means any guarantor of all or any portion of Lessee's obligations under this Master Agreement and/or any Lease.

(f) **"Other Financed Items"** has the meaning specified in Section 4.

(g) **"Periodic Lease Payment"** has the meaning specified in Section 4.

(h) **"Pricing Expiration Date"** means, as to any Lease, the date set forth in the Schedule for such Lease or, if no date is specified, the date is thirty (30) days following the date of delivery of the Equipment subject to such Lease, to the Equipment Location.

(i) **"Purchase Documents"** means, as to any Equipment, any purchase agreement, purchase order, contract, bill of sale, license agreement, invoice and/or other documents that Lessee has, at any time, approved, agreed to be bound by or entered into with any Supplier of such Equipment relating to the purchase, ownership, use or warranty of such Equipment.

(j) **"Related Agreements"** has the meaning specified in Section 4.

(k) **"Schedule"** means, a Schedule executed by Lessor and Lessee pursuant to Section 2(A).

(l) **"Seller"** means, as to any Equipment, the seller of such Equipment, as specified in the applicable Schedule.

(m) **"Supplier"** means, as to any Equipment, the Seller and the manufacturer or licensor of such Equipment collectively, or where the context requires, any of them.

(n) **"Taxes"** means any and all taxes, duties, charges, fees, levies or other assessments imposed by any taxing authority, including, without limitation, value-added, excise, withholding, personal property, real estate, sale, use, ad valorem, license, lease, service, stamp, transfer, customs, duties, alternative, add-on, minimum, estimated and franchise taxes (including any interest, penalties or additions attributable to or imposed on or with respect to any such assessment).

(o) **"Term"** means, as to any Lease, the term thereof as specified in the related Schedule.

Equipment Finance Agreement

EFA No. <u>02086-001L</u>

Between AILCO EQUIPMENT FINANCE GROUP, INC. (the "Creditor")
W222 N833 Cheaney Dr., Waukesha, WI 53186
And <u>Chicago Surgical Clinic, LTD.</u> (the "Debtor")
Debtor Address: <u>129 W. Rand Rd.</u> City: <u>Arlington Heights</u> State: <u>IL</u> Zip: <u>60004</u>

This Equipment Finance Agreement (the "EFA") is made and entered into by and between the Creditor and Debtor identified above. If more than one party executes this EFA as Debtor, each shall be jointly and severally liable hereunder.

| FULL DESCRIPTION OF COLLATERAL INCLUDING MAKE, MODEL & SERIAL NUMBERS: |
|---|
| (3) Philips Burton AIM LED Single Ceiling Procedure Light, 3 LED Modules, 45,000 LUX @ 1 Meter, 4300 K, 5 Yr Limited Warranty, 120 V |
| (1) Philips Burton AIM LED Dual, Ceiling Mount Procedure Light, 120 V, 3 LED modules, 45,000 LUX @ 1 Meter\Head, 4300 K, 5 Yr Limited Warranty |
| (1) Tuttnauer EZ Automatic Autoclave with Printer, Closed Door Drying, 10" X 19" Chamber, 3 Programmable Cycles, Auto Off with Purge, 120 V |

COLLATERAL LOCATION: 129 W. Rand Rd., Arlington Heights, IL 60004

| TERM OF EFA: 60 Months | NUMBER OF PAYMENTS: 60 | MONTHLY PAYMENT:<br>1 @ $485.00<br>5 @ $115.00<br>53 @ $370.00<br>1 @ $0.00 |
|---|---|---|
| EFA AMOUNT: $16,971.00 | EFA COMMENCEMENT DATE: | 5/15/15 |

Terms of the Equipment Finance Agreement

Debtor and Creditor agree as follows:

1. SECURITY INTEREST. Debtor hereby grants Ailco Equipment Finance Group, Inc. ("Creditor") a security interest under the Uniform Commercial Code in the above property (collectively the "Collateral" and individually as "Item" or "Item of Collateral"). Such security interest is granted to secure performance by Debtor of its obligations hereunder and under any other present or future agreement with Creditor. Debtor shall insure that such security interest is and shall remain a sole first lien security interest. DEBTOR HEREBY AUTHORIZES CREDITOR TO FILE A COPY OF THIS AGREEMENT (IF APPROPRIATE) AS A FINANCING STATEMENT AND APPOINTS CREDITOR OR ITS DESIGNEE AS DEBTOR'S ATTORNEY-IN-FACT TO EXECUTE AND FILE, ON DEBTOR'S BEHALF, ANY FINANCING STATEMENT(S) COVERING THE COLLATERAL DEEMED APPROPRIATE BY CREDITOR.

2. PAYMENTS. Debtor agrees to and shall repay Creditor the above payments in the number of monthly installments of the amount indicated above. The initial installment payment shall be deemed due as of the date indicated above and subsequent installment payments shall be due on the same day of each subsequent month until all payments are made. A prorata portion of the installment payment based on a daily charge of one-thirtieth (1/30) of the monthly payment calculated from the acceptance date to the commencement date shall be due and payable at the EFA commencement date. All other amounts due thereunder shall be due upon Debtor's receipt of Creditor's invoice/coupon therefor. Advance payments shall be applied to the last installment payments in reverse order until exhausted; provided that if there is a default, any payments under this agreement may be applied to Debtor's obligations to Creditor in such order as Creditor chooses.

3. NO AGENCY. DEBTOR ACKNOWLEDGES THAT NO SUPPLIER OF ANY ITEM OR INTERMEDIARY NOR ANY AGENT OF EITHER THEREOF IS AN AGENT OF CREDITOR AND FURTHER THAT NONE OF SUCH PARTIES IS AUTHORIZED TO WAIVE OR ALTER ANY ITEM OR CONDITION OF THIS AGREEMENT. NO REPRESENTATION AS TO ANY MATTER BY ANY SUCH PARTY SHALL BIND CREDITOR OR AFFECT DEBTOR'S DUTY TO PAY THE INSTALLMENT PAYMENTS AND PERFORM ITS OTHER OBLIGATIONS HEREUNDER.

4. NON CANCELABLE AGREEMENT; PREPAYMENT; NO OFFSET. THIS AGREEMENT IS NON CANCELABLE BY DEBTOR FOR ANY REASON WHATSOEVER. DEBTOR MAY REPAY THE INSTALLMENT PAYMENTS ONLY IN ACCORDANCE HEREWITH. ALL PAYMENTS, AND OBLIGATIONS FOR PAYMENT, BY DEBTOR HEREUNDER ARE TO BE MADE WITHOUT ANY OFFSET.

5. FINANCING, WARRANTIES, SOFTWARE & EXECUTION. THIS AGREEMENT IS SOLELY A FINANCING AGREEMENT. CREDITOR MAKES NO WARRANTY WITH RESPECT TO THE COLLATERAL, EXPRESS OR IMPLIED, OR THAT THE COLLATERAL IS FIT FOR A PARTICULAR PURPOSE OR THAT THE COLLATERAL IS MERCHANTABLE. DEBTOR AGREES THAT DEBTOR HAS SELECTED THE SUPPLIER AND EACH ITEM OF COLLATERAL BASED UPON DEBTOR'S OWN JUDGMENT AND DISCLAIMS ANY RELIANCE UPON ANY STATEMENTS OR REPRESENTATIONS MADE BY CREDITOR. CREDITOR DOES NOT TAKE RESPONSIBILITY FOR THE INSTALLATION OR PERFORMANCE OF THE COLLATERAL. THE SUPPLIER IS NOT AN AGENT OF CREDITOR AND NOTHING THE SUPPLIER STATES CAN AFFECT DEBTOR'S OBLIGATION UNDER THE AGREEMENT. DEBTOR WILL CONTINUE TO MAKE ALL PAYMENTS UNDER THIS AGREEMENT REGARDLESS OF ANY CLAIM OR COMPLAINT AGAINST SUPPLIER OR ANY OTHER PARTY.